United States Court of Appeals,

Eleventh Circuit.

Nos. 93-8706, 93-8751.

UNITED STATES of America, Plaintiff-Appellee,

v.

Ed PAGE, a/k/a Ed Rose, Mary M. Jackson, a/k/a Mary King, a/k/a
Denise Wood, a/k/a India Bullock, Doris Y. Rogers, a/k/a Evon
Rogers, a/k/a Evon Wellington, Davis Scalise, a/k/a David Baker,
Defendants-Appellants,


UNITED STATES of America, Plaintiff-Appellee,

v.

Seeta McKNIGHT, Defendant-Appellant.

Nov. 16, 1995.

Appeals from the United States District Court for the Northern
District of Georgia. (Nos. 1:92-cr-111-1, 1:92-cr-111-8), Harold L.
Murphy, Judge.

Before CARNES, Circuit Judge, DYER and GARTH[*], Senior Circuit
Judges.

GARTH, Senior Circuit Judge:

Defendants Seeta McKnight, Edsel ("Ed") Page, Mary Jackson,

Doris Rogers, and David Scalise were each indicted on a 31-count

indictment, charging them with conspiracy to defraud under 18

U.S.C. § 371;  24 counts of mail fraud under 18 U.S.C. §§ 1341,

1342;  and six counts of wire fraud under 18 U.S.C. §§ 1343, 1342.

Seeta McKnight pleaded guilty, and the remaining defendants were

convicted after a jury trial on all 31 counts.  On appeal, various

---

[*]Honorable Leonard I. Garth, Senior U.S. Circuit Judge for
the Third Circuit, sitting by designation.

defendants challenge their convictions and sentences on a number of different grounds, including "vulnerable victim" enhancement, restitution, admission of similar act evidence, lack of pretrial notice with respect to certain similar act evidence, "minor role," insufficient evidence, and withdrawal from conspiracy.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We will vacate and remand for resentencing, the case against Seeta McKnight, No. 93-8751, as well as the case against the other defendants, No. 93-8706, for implementations of *United States v. Jones,* 899 F.2d 1097 (11th Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), *overruled on other grounds,* 984 F.2d 1136, 1137 (11th Cir.1993) (en banc) and *United States v. Remillong,* 55 F.3d 572 (11th Cir.1995).[1] We will affirm the judgments and sentences imposed by the district court in all other respects.

## I.

From September to December of 1991, Seeta McKnight, Ed Page, Mary Jackson, Doris Rogers, and David Scalise participated in an "advance fee loan scheme" in which they falsely promised loans to customers to collect the customers' advance fees. McKnight was a founder of the scheme. Page, Jackson, Rogers, and Scalise, were telemarketers who worked under her direction.

In September of 1991, McKnight and her brother-in-law Graham

---

[1]See our discussion, infra, Part IV, concerning the impact on all of the defendants of the district court's joint and several restitution order.

Tomlins[2] opened the advance fee loan scheme under the name of Certified Financial, at 290 Hilderbrand Drive, Suite B-11, Atlanta, Georgia.  In early October of 1991, McKnight and Paul Brown, whom Seeta McKnight had hired to be the office manager,[3] placed advertisements in newspapers and journals, outside of Georgia, throughout the United States.  The advertisements stated:

LOANS AVAILABLE NOW
Program for bad credit.
Job verification required.

(Transcript of Trial at 646).  McKnight and Brown hired telemarketers to answer calls responding to the advertisements. Page, Jackson, Rogers, and Scalise were among the telemarketers that they hired.

The telemarketers used aliases in speaking to callers.  Ed Page used "Ed Rose," Mary Jackson used "Mary King," Doris Rogers used "Evon Rogers," and David Scalise used "David Baker."  The telemarketers followed a script that McKnight had provided.  First, they would ask personal information from the callers:

> Certified Financial.  How may I help you?  All right.  Let me just ask you a few questions to see if you qualify.  Are you over 21 years of age?  Have you ever been bankrupt, had repossessions or foreclosures.  How much do you want to borrow?  Who do you work for?  How long have you worked there? ... Does your wife or husband work?  What is your combined monthly income?  Also I need your Social Security number and I need your address and telephone number.

(Transcript of Trial at 43, 315).  Then the telemarketers, again following the script, set out the "terms" of the loan:

---

[2]Tomlins was indicted separately on September 8, 1993.  He is not a party to this appeal.

[3]Brown pleaded guilty to five counts of the superseding indictment and testified in the government's case.

> All right, our terms are from 1 to 10 years. The interest rate will not be more than 16 per cent and may be as low as 12 per cent. The rate is fixed and there is no early repayment penalty.
>
> Have you been to a bank or anyone else for this loan? Well, you'll be pleased to know that we're not a bank. We work with individual lenders and when we can find one that will handle your kind of request we will require a fee of $250. That's the only fee you will have to pay and only if we find you a lender, naturally. Now, I will need about 1 hour before I have an answer from the lenders. So, could I ask you to call me back? Do you have a pen and paper?

*Id.* at 44. Telemarketers testified that, contrary to what they told the customers, they did not check for lenders during the hour but instead "approved" the customer for the loan as long as the customer made at least $1,000 per month.

When the customers called back to ask about their loan applications, the telemarketers, again following the script, would say:

> Certainly, I'll check on that for you. One moment please. Sorry to keep you holding on. I'll have it in just a minute. Oh, good news. We have been successful and found you a lender for that amount.

(Transcript of Trial at 45-46).

The telemarketers then told the customers that the loan was being held for only 72 hours, *id.* at 46, and that they should send a $250 money order to Certified Financial. They also urged the customers to send the money by Federal Express. *Id.* at 46-47. Postal Inspector Marcia Fresco testified that perpetrators of advance fee loan schemes often advise their victims to use Federal Express as an attempt to avoid mail fraud liability.

The telemarketers then told the customers that they would receive their loan proceeds within one week or 14 days, and that their $250 fee would be refunded if they did not get the loan.

Page, Rogers, Jackson, and Scalise also departed from the script to tell customers that their loans had been "approved" or "guaranteed," despite being instructed not to do so.

The telemarketers then sent out reservation letters with applications to the customers, using their aliases. The reservations letters stated:

> Since our telephone call I have discussed your loan with our senior broker. He agrees that we should push ahead with your application particularly as we have found a lender who is willing to handle your request ...

> If you have not already sent your Money Order for $250.00 I strongly suggest that you send it as I cannot hold this reservation much longer.

> When you send your papers back to us, please mark them and the Money Order with your Reservation Number to ensure that everything goes smoothly....

(Transcript of Trial at 69-70). The telemarketers testified that there was no "senior broker" and that they did not even attempt to find lenders for the callers who submitted $250 and completed applications.

Fourteen days after Certified Financial began operation, customers began to call in to ask about their loan proceeds. After three weeks had passed, customers began to call in with complaints. McKnight hired a "customer service representative" to handle complaints full time. The customer service representative sat in the same room as the telemarketers and would take customer's complaints while the telemarketers talked to new customers. Rogers, using a different alias than her telemarketing alias, sometimes handled customer service calls. By November of 1991, a large volume of complaint calls was coming into Certified Financial.

In mid-November, the Postal Inspection Service began receiving complaints from customers about Certified Financial and began an investigation.

At about this time, Page, who had been working at Certified Financial for about six weeks, left to join another advance-fee loan scheme as a telemarketer. Scalise did the same on November 22, 1991, after working at Certified Financial for seven weeks. Neither Page nor Scalise notified the victims or the authorities that Certified Financial was a fraudulent scheme.

On December 5, 1991, McKnight shut down Certified Financial, moved the advance fee loan scheme to 1060 Concord Road in Smyrna, Georgia and changed the scheme's name to Consumer Funding Services. Later, McKnight again changed the name to Cypress Fidelity Services. Rogers worked at the new location under the alias "Violet Wellington," and Jackson used the alias "Denise Wood." The scheme operated at the new location for approximately one week. Altogether, Rogers worked a total of about 10 weeks at the two advance loan schemes. Jackson worked approximately 9 weeks.

On December 13, 1991, Paul Brown was arrested as a result of the Postal Inspection Service's investigation. McKnight immediately telephoned her telemarketers those on duty to abandon the premises.

On December 19, 1991, Postal Inspectors with a search warrant searched the automobile owned by McKnight's husband and seized documents and records pertaining to Certified Financial, Consumer Funding Services, and Cypress Fidelity Services. Among other things, the Postal Inspectors found Federal Express receipts

showing that on December 18, 1991, Rogers accepted three Federal Express Packages addressed to Consumer Funding Services.

On December 20, 1991, Postal Inspector Marsha Fresco interviewed Jackson who admitted working at Certified Financial but said that she quit when numerous complaints started coming in. Jackson did not mention working at Consumer Funding or Cypress Fidelity.

On the same day, Postal Inspector Gary Cantley interviewed Scalise by telephone. Scalise denied ever working as a salesperson or telemarketer at Certified Financial and said that he only worked there as a carpenter/repair person during off hours.

The inspection later revealed that on December 20, 1991, Rogers opened a check cashing account at Check-X-Change and cashed two money orders in the amount of $250 payable to Consumer Funding Service.

On January 3, 1992, Postal Inspectors with a search warrant searched the office of Consumer Funding/Cypress Financial and seized documents relating to that entity.

Over the course of its investigation, the Postal Inspection Service found that approximately 424 victims who had sent in $250 fees to the advance fee loan scheme. (Transcript of Trial at 66). Not one of the approximately 100 customers interviewed ever received the promised loan.

All five defendants were charged, in the Superseding Indictment, with conspiracy to defraud under 18 U.S.C. § 371; 24 counts of mail fraud under 18 U.S.C. §§ 1341, 1342, and six counts of wire fraud under 18 U.S.C. §§ 1343, 1342.

On September 1, 1992, six months before trial, the government sent defendants a letter notifying them of its intention to present evidence at trial, pursuant to Fed.R.Evid. 404(b), showing that the defendants had worked at other advance fee telemarketing schemes before and after working at Certified Financial and Consumer Funding/Cypress Fidelity.

On the morning of the first day of trial, McKnight pleaded guilty to all 31 counts of the Superseding Indictment and later testified for the government at trial.  The remaining defendants, Page, Rogers, Jackson, and Scalise were tried together in a multi-defendant jury trial, which was held from March 1, 1993 to March 11, 1993.  Page, Rogers, Jackson, and Scalise sought to prove that they did not know that Certified Financial and Consumer Funding/Cypress Fidelity were not actually arranging loans, and that they therefore lacked the requisite intent to defraud.

At trial, over the defendants' objections, the district court admitted evidence that Page, Rogers, Jackson and Scalise had each been employed in other advance fee loan schemes shortly before and/or shortly after working at Certified Financial.  The district court gave the jury limiting instructions regarding this similar act evidence.

Page, Rogers, Jackson and Scalise were each convicted on all 31 counts of the Superseding Indictment.  In sentencing each of these defendants and McKnight, the district court enhanced the offense level of each defendant for specifically targeting persons with credit and financial problems pursuant to U.S.S.G. § 3A1.1. The district court denied the requests of Page, Rogers, Jackson,

and Scalise to reduce their offense levels pursuant to U.S.S.G. § 3B1.2 for being minor participants in the scheme.

By Judgments entered May 20, 1993, Seeta McKnight was sentenced to 36 months of incarceration on each count, to be served concurrently; Page was sentenced to 21 months of incarceration on each count, to be served concurrently; and Jackson was sentenced to 24 months of incarceration on each count, to be served concurrently. By Judgment entered July 7, 1993, Rogers was sentenced to 24 months of incarceration on each count, to be served concurrently. By Judgment entered July 27, 1993, Scalise was sentenced to 24 months of incarceration on each count, to be served concurrently. Each of the five defendants was also sentenced to three years of supervised release following their terms of imprisonment; joint and several restitution of $106,000; and a special assessment of $1,550. No objection was made to the sentence of restitution at that time. The district court denied Page's motion for acquittal.

Each of the defendants separately appealed. Their appeals have been consolidated for disposition before this Court.

II.

A.

All five defendants challenge their sentences, arguing among other things that the district court erred in increasing each of their offense levels under U.S.S.G. § 3A1.1 for targeting victims with "bad credit."[4] " "The district court's application of § 3A1.1

_____

[4]By the time this matter was orally argued before us on September 13, 1995, four of the five defendants had finished serving their prison terms; and the fifth was in a halfway

presents a mixed question of law and fact, which we review *de novo.' " United States v. Thomas,* 62 F.3d 1332, 1344 (11th Cir.1995) (quoting *United States v. Davis,* 967 F.2d 516, 523 (11th Cir.1992), *rehearing on other grounds,* 30 F.3d 108 (11th Cir.1994)). We have recognized, however, that the district court's determination of a victim's "vulnerability" is essentially a factual finding to which we should give due deference. *See United States v. Salemi,* 26 F.3d 1084, 1087 (11th Cir.1994) ("The determination of vulnerability is a factual finding which is entitled to due deference on review") (citation omitted), *cert. denied,* --- U.S. ----, 115 S.Ct. 612, 130 L.Ed.2d 521 (1994); 18 U.S.C. § 3742(e) ("The court of appeals ... shall give due deference to the district court's application of the guidelines to the facts.").[5] Further, the district court's findings of

---

house, according to defense counsel. Thus whether this appeal was moot was a potential issue, though not one raised by the government. We hold that this appeal is not moot.

First, the Supreme Court has recognized that " "the possibility of a criminal defendant's suffering "collateral legal consequences' from a sentence already served' precludes a finding of mootness." *Minnesota v. Dickerson,* --- U.S. ----, ---- n. 2, 113 S.Ct. 2130, 2134 n. 2, 124 L.Ed.2d 334 (1993) (citations omitted). Because "[a] number of disabilities may attach to a convicted defendant even after he has left prison," a defendant who has finished serving his sentence still has standing to challenge the legality of his conviction. *North Carolina v. Rice,* 404 U.S. 244, 247, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

Second, all of the defendants are at least still serving their terms of supervised release, which involve restrictions on their liberty. Only success in this appeal could alter the supervised release portion of their sentences. *See Dawson v. Scott,* 50 F.3d 884, 886 n. 2 (11th Cir.1995).

[5]The "due deference" standard in 18 U.S.C. § 3742 "serves as an additional caution against overly intense judicial review."

historical fact cannot be reversed unless clearly erroneous. *United States v. Davis,* 967 F.2d 516, 523 (11th Cir.1992), *rehearing on other grounds,* 30 F.3d 108 (11th Cir.1994).

B.

Section 3A1.1 of the Sentencing Guidelines provides for a two-level upward adjustment to the defendant's offense level:

> If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct.

U.S.S.G. § 3A1.1. The commentary to section 3A1.1 provides that sentence enhancement is warranted with respect to "offenses where an *unusually vulnerable victim* is *made a target* of criminal activity by the defendant." (Application Note 1 to U.S.S.G. § 3A1.1). (emphases added). For example, the adjustment would apply:

> in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

(Application Note 1 to U.S.S.G. § 3A1.1).

This court has clearly recognized that the "vulnerable

---

*United States v. Mejia-Orosco,* 868 F.2d 807, 808 (5th Cir.1989), *cert. denied,* 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989). The "purported purpose" of the "due deference" clause of § 3742 is " "to give the court of appeals flexibility in reviewing the application of a guideline standard that involves some subjectivity.' " *Id.* at 809 (citing Congressional Record at H11257 (1988)). As we stated in *United States v. Long,* 935 F.2d 1207 (11th Cir.1991), "[w]e review the factual findings underlying the district judge's decision for "clear error,' but we review his application of the sentencing guidelines to those facts with only "due deference.' " *Id.* at 1211.

victim" adjustment "focuses chiefly on the conduct of the defendant" and should be applied only where "*the defendant selects the victim* " due to the victim's perceived vulnerability to the offense. *Long,* 935 F.3d at 1210. We stated that:

> [T]he applicability of section 3A1.1 turns on the defendant's decision to target the victim. The section does not authorize sentence enhancement based upon the severity of the victim's suffering. A victim's testimony can be relevant to the sentencing court's determination of "vulnerability," but only to the extent that the victim discusses facts that might have been known to defendants and motivated the defendants in selecting the victim.

*Id.* at 1211.[6] Thus, to determine whether defendants have targeted "vulnerable victims," we look to "the facts known to defendants when they decided to target the [victims]." *See id.* at 1212.

### III.

It is clear that having bad credit or otherwise being in a precarious financial situation is a "vulnerability" to fraudulent financial solicitations such as the advance fee loan scheme in this case. *See United States v. Borst,* 62 F.3d 43, 46 (2d Cir.1995) (affirming "vulnerable victim" sentence enhancement where defendant's mobile home financing scheme targeted persons with financial difficulties); *United States v. Holmes,* 60 F.3d 1134, 1137 (4th Cir.1995) ("It is manifest that persons with poor credit ratings who have been turned down elsewhere for loans would be

---

[6]Thus the focus is not on the harm actually suffered by the "vulnerable victim." *See United States v. Yount,* 960 F.2d 955, 958 (11th Cir.1992) (defendant who had embezzled money from trust accounts belonging to elderly and infirm people warranted "vulnerable victim" enhancement even though the bank reimbursed the victims such that the latter did not suffer harm); *United States v. Salemi,* 26 F.3d 1084, 1088 (11th Cir.1994) (holding that a six-month-old baby was a "vulnerable victim" to kidnapping even though the baby was not harmed), *cert. denied,* --- U.S. ----, 115 S.Ct. 612, 130 L.Ed.2d 521 (1994).

unusually vulnerable, that is, more prone than most to yield to the melodious beseeching of a charlatan who assures them that their dreams are within their grasp"); *United States v. Peters,* 962 F.2d 1410, 1418 (9th Cir.1992) (persons with poor credit histories were particularly susceptible to credit card fraud).

A closer issue in this case is whether the defendants *targeted* persons with bad credit. The district court found that they did, and we agree.

### A.

Section 3A1.1 provides that "vulnerable victim" enhancement is appropriate, for instance, "in a fraud case where the defendant marketed an ineffective cancer cure." (Application Note 1 to § 3A1.1). On the other hand, the "vulnerable victim" enhancement is not appropriate where, for example, "the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." *Id.* We are persuaded that the instant case is more closely analogous to the ineffective cancer cure illustration found in Application Note 1 of § 3A1.1.

The scheme in this case was not simply a loan fraud aimed at the general public. McKnight advertised a "Program for bad credit." The district court found that "[t]he intent clearly of the ads was to prey upon people with financial problems, troubled people, people desperate for loans as indicated by the advertisements themselves." (Sentencing Hearing of Seeta McKnight, May 14, 1993 at 18). Indeed, one of the victims, Tracey Shafer, testified that she understood the advertisement to be "an ad to apply for a loan if you had poor credit or a bad credit history or

bankruptcy." (Transcript of Trial at 511). Another victim, Pamela Westbrook, testified that the advertisement "was about loans, and that it was something to the fact of not worrying about credit history or past credit problems." *Id.* at 597. Yet another victim, Nathan Councilman thought "the gist of the ad was loans by mail, bad credit, no problem, poor credit, no problem." *Id.* at 617.

Furthermore, once the victims called in to inquire about the loan, the script, as written by McKnight and delivered by the telemarketers, focused on persons with bad credit. The script directed the telemarketers to ask whether the customer had been to a bank or anyone else for this loan. John Beach, who had worked at Certified Financial as a telemarketer, testified that the purpose of this question was to find out how easy of a target the victim was; and thus how eagerly the telemarketer should pursue the victim. Beach explained:

> If they say yes to this, they have been turned down, the odds are ninety percent you're going to get this person's money, because he's already been through the experience of being turned down. If he says no, he hasn't been to a bank, this may lead you to shy away from him a little bit because he may not send the money in. He may still go to a bank. You're looking for immediate response from these people in a matter of 24 to 36 hours.

(Transcript of Trial at 316).

The script then went on to say: "Well, you'll be pleased to know that we're not a bank." *See id.* at 317. The intent of this part of the script was clearly to offer hope to desperate persons whose applications had been rejected by banks or other commercial institutions. Thus, as Beach testified, Certified Financial was targeting "basically low income, people that have poor credit, bankruptcies." *Id.* at 277. The scheme targeted people with bad

credit because "they're desperate for money."  *Id.*

Hence, the present case is not a broad-based fraud aimed at the general public but which happens to ensnare a few particularly "vulnerable victims."[7]  The advance fee loan scheme at issue here specifically addressed itself to persons with bad credit. Accordingly, like the promise of a cancer cure to persons afflicted with cancer, the advance fee loan scheme in the present case targeted the most desperate victims.[8]

B.

---

[7]*United States v. Wilson,* 913 F.2d 136 (4th Cir.1990), which the defendants cite, is distinguishable.  In *Wilson,* the Fourth Circuit declined to find that Wilson had targeted vulnerable victims under section 3A1.1 where he had fraudulently solicited cash donations for tornado victims by sending solicitation letters to five residents of Raleigh, North Carolina, an area recently hit by a tornado.

The limited nature of the *Wilson* holding, however, is evident from the Fourth Circuit's recent opinion in *United States v. Holmes,* 60 F.3d 1134 (4th Cir.1995).  *Holmes* held that the defendant, who had engaged in a mortgage loan scheme, warranted sentence enhancement under § 3A1.1 where he admitted that he was targeting persons with credit problems, and where two of his victims testified that they were drawn to the defendant's scheme because they were unable to obtain mortgage loans elsewhere.  In *Holmes,* the Fourth Circuit read *Wilson* as rejecting § 3A1.1 enhancement because there had been no showing that any of the randomly selected victims were more susceptible to the tornado relief fund scheme than most persons asked to provide donations for disaster relief.  *Holmes,* 60 F.3d at 1135.  In contrast, it is well established that persons with bad credit are more susceptible than other potential victims to credit frauds.

[8]The telemarketer defendants (Page, Rogers, Jackson, and Scalise) allege that they cannot be held accountable for the advertisement because it had been drafted by McKnight only.  We disagree.  The telemarketer defendants participated in the same conspiracy, and knew about and benefitted from the advertisement. Thus, we find that they are equally culpable for the advertisement.  Furthermore, there can be no dispute that the telemarketers are accountable for the content of the scripts which they willingly and repeatedly delivered.

Further, the record shows that even if the telemarketer defendants did not initially know of their victims' vulnerabilities, they warrant § 3A1.1 enhancement because they learned of such vulnerabilities at some point during the loan fraud yet continued to perpetrate the fraud against victims whom they knew to be unusually vulnerable to the loan scheme.

In our recent decision in *United States v. Thomas,* 62 F.3d 1332 (11th Cir.1995), we held that "where the "thrust of the wrongdoing' was continuing in nature, the defendant's attempt to exploit the victim's vulnerability will result in an enhancement even if that vulnerability did not exist at the time the defendant initially targeted the victim." *Id.* at 1345.

*Thomas,* like the present case, involved an advance fee loan scheme. After commencing the fraud against Colonel Lewis, the defendants learned that he had to leave the country on short notice and would be gone for a lengthy period of time. Before he left, Lewis gave the defendants a power of attorney, which the defendants later used to obtain two loans without his knowledge. We affirmed the district court's finding that Lewis's absence from the country was a "vulnerability" to the fraud, and we found that the defendant's exploitation of Lewis's absence sufficiently constituted "targeting" or "retargeting" of Lewis for purposes of § 3A1.1. Even though Lewis's vulnerability (absence from the country) did not exist at the time that the defendants first targeted him, we agreed with the district court that the defendants warranted a § 3A1.1 because the "thrust of the wrongdoing" was "continuing" in nature, and the defendants exploited the

vulnerability once it appeared.

The "thrust" of the fraud here was also "continuing" in nature. The fraud was set up in several steps: (1) the newspaper advertisements encouraging people to call; (2) the telemarketers taking the customer's personal information to see if the customer "qualifies" for a "loan," (3) the telemarketers telling the customer of the "terms" of the "loan;" (4) the telemarketers instructing the customer to call back after an hour to see if the "loan" was "approved," (5) the telemarketers telling the customer that the "loan" was "approved" and urging the customer to send in the $250 by overnight mail to hold the loan; (6) the customer sending in the money.

At an early stage of the fraud, the defendants learned of their victims' financial profiles, including in many instances, their financial desperation. The script instructed the telemarketers to ask, among other things, if customers had ever been bankrupt, had repossessions or foreclosures; how much they wanted to borrow; who they were working for and for how long; their income and the income (if any) of their spouse. (Transcript of Trial at 315). In listening to the customers' responses to these questions, each of the four telemarketer defendants had occasion to learn of the bad credit or other serious financial difficulties of at least some of their victims.

For example, Page persuaded Susan Sirmans to send in the $250 fee for the "loan" even though she told him that she made a little less than $550 every two weeks and that her husband had been unemployed for quite a while. (Transcript of Trial at 656).

Rogers persuaded Saundra Hawkins, to send in $250 even though Hawkins had to take that amount out of her mortgage payment. *Id.* at 913. Rogers also persuaded Denise Jones to send the $250 even after learning that Jones, who needed the money because she had just had a baby and also needed a car, only made $526 every two weeks and that her husband made about the same amount of money by holding down two jobs. *Id.* at 629-31.

Scalise persuaded Nathan Councilman to send in the $250 for the "loan" after Councilman had explained that he needed the loan because he was going through a divorce and had bad credit. *Id.* at 618.

Jackson apparently felt so badly about the financial plight of Sonia Gibbs, who desperately needed the money because her car was about to be repossessed, that she, Jackson, refunded Gibbs her fee. *Id.* at 1162. On other occasions, however, Jackson did not hesitate to collect the $250 fee from James Brundage who told her that he needed the loan because he was just coming out of Chapter 13 bankruptcy, *id.* at 490; from Pamela Westbrook, who needed the loan to pay rent that she owed in arrears, *id.* at 601; or from Laurie Cornell, who was overextended on her credit cards and other debts. *Id.* at 609.

Thus we find that the record amply supports the conclusion that, whether or not they initially knew of the victims' vulnerabilities (bad credit or desperate financial situations), the telemarketer defendants learned of those vulnerabilities by asking personal financial information of the customers; yet persisted in carrying out the fraud against them. Accordingly, we are satisfied

that under our recent decision in *Thomas,* that the telemarketers "targeted" "vulnerable victims" for purposes of § 3A1.1.

C.

The defendants argue that "vulnerable victim" enhancement is inappropriate here because people with good incomes also answered the advertisement, including a deputy sheriff, an employee at the Bank of New York, and a woman whose combined income with her husband was $60,000-$70,000. We disagree.

We will not absolve the defendants of their culpability for having targeted "vulnerable victims" simply because, in casting out their net, they happened to ensnare and defraud some individuals who did not share this vulnerability. *See United States v. Small,* 35 F.3d 557 (4th Cir.1994) ("Our review of the record discloses that the district court was not clearly erroneous in finding that Small targeted especially vulnerable victims, even though he also defrauded people who were not in this category."); *see e.g. United States v. Thomas,* 62 F.3d 1332 (11th Cir.1995) (upholding § 3A1.1 enhancement on both defendants where one of the defendants' 15 victims was "vulnerable"); *United States v. Holmes,* 60 F.3d 1134, 1137 (4th Cir.1995) ("vulnerable victim" enhancement appropriate where defendant admitted to targeting persons with bad credit in his mortgage fraud scheme, even though the government only produced evidence that two of the 78 victims were drawn to the scheme because they had bad credit).

In conclusion, we hold that the district court did not err in finding that the defendants targeted "vulnerable victims," and by so doing were subject to sentence enhancement pursuant to section

3A1.1.

IV.

Seeta McKnight contends that the district court erred in ordering her to pay restitution of $106,000, jointly and severally with her co-defendants, without considering her financial means. In addition, even though the remaining defendants, Page, Rogers, Jackson, and Scalise, did not raise the issue of restitution in their appeal briefs before us, the district court's restitution order necessarily must affect them as well, as it was imposed on all five defendants on a joint and several basis. Because of that fact, and because the cases of the other four defendants are before us in this appeal anyway, we exercise our discretion to consider the restitution issue as though each defendant in this appeal had raised it.

We normally will not entertain error that was not preserved in the district court, nor error that has been waived in this court. Here, as noted, no defendant objected at the time of sentencing, and all of the defendants other than McKnight failed to raise in their briefs to this Court any issue involving compliance with *Jones* or as to restitution. Nevertheless, because under our supervisory powers we have required the district court to conduct certain inquiries during the sentencing process, *see United States v. Jones,* 899 F.2d 1097, 1102 (11th Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), *overruled on other grounds,* 984 F.2d 1136, 1137 (11th Cir.1993) (en banc), we will review the defendants' sentences here. In doing so, we will vacate the sentences imposed on all of the defendants by the district

court, and we will remand for resentencing.

A.

As a threshold matter, we find that the district court, in sentencing McKnight, Page, Jackson, and Scalise, failed to comply with *United States v. Jones,* 899 F.2d 1097 (11th Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), *overruled on other grounds,* 984 F.2d 1136, 1137 (11th Cir.1993) (en banc).[9]

In *Jones,* we ruled pursuant to our supervisory power, that after imposing a sentence, the district court must give the parties an opportunity to object to the court's ultimate findings of facts and conclusions of law, and to the manner in which the sentence is pronounced. *Id.* at 1102. Moreover, we required that the district court elicit from counsel a full articulation of the grounds on which any objection is based. *Id.* "Where the district court has not elicited fully articulated objections following the imposition of sentence, this court will vacate the sentence and remand for further sentencing in order to give the parties an opportunity to raise and explain their objections." *Id.* at 1103. On the other hand:

> Where the district court has offered the opportunity to object and a party is silent or fails to state the grounds for objection, objections to the sentence will be waived for purposes of appeal, and this court will not entertain an appeal based upon such objections unless refusal to do so would result in manifest injustice.

---

[9]The district court did provide Rogers with an opportunity to put "any exceptions into the record" after it had imposed sentence on her. (Transcript of Sentencing Hearing, July 2, 1993, at 21). Rogers' counsel did not make any objections at that point. *Id.*

*Id.*

In the present case, after the district court stated its findings and imposed its sentence on McKnight, it did not solicit, and McKnight did not make, any objections to the restitution order or to any other portion of the sentence. (Transcript of Sentencing Hearing of Seeta McKnight, May 14, 1993, at 16-20, 24-26). The court simply advised McKnight that she had the right to appeal the sentence. *Id.* at 26. Thereafter, McKnight's counsel only asked that McKnight be allowed a 60 day delay in her date of surrender: a request that the court granted. *Id.* at 27.

The district court's obligation to make a *Jones* inquiry was not excused by the fact that McKnight, in her plea agreement, "acknowledge[d] that the Court may order restitution as part of the sentence imposed in the instant case." (Negotiated Plea Agreement, ¶ 2). While she acknowledged that restitution could be imposed, McKnight did not thereby agree to pay any and all amounts of restitution. Thus, she did not waive her right to contest what she now claims to be an excessive amount of restitution.

Similarly, the district court failed to solicit any objections after imposing sentences on Page and Jackson. (Transcript of Sentencing Hearing of Edsel Page, May 14, 1993, at 12-14); (Transcript of Sentencing Hearing of Mary Jackson, May 14, 1993, at 34). With respect to Scalise, the district court asked only for any "exceptions" to its application of the Sentencing Guidelines, but it did not provide the parties with a broader opportunity to object. (Transcript of Sentencing Hearing of David Scalise, July 22, 1993, at 18).

Accordingly, the district court on remand will be obligated to make the appropriate *Jones* inquiries with respect to McKnight, Page, Jackson, and Scalise. Rogers, as we have noted, *see supra,* footnote 9, was afforded an opportunity to except to her sentence.

B.

Furthermore, the district court's order cannot be implemented in light of that court's failure to consider each defendant's ability to pay. Section 3664 of title 18 of the United States Code provides that:

> The court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall *consider* the amount of the loss sustained by any victim as a result of the offense, *the financial resources of the defendant, the financial needs and earning ability of the defendant* and the defendant's dependents, and such other factors as the court deems appropriate.

18 U.S.C. § 3664(a) (emphases added). We have recently held in *United States v. Remillong,* 55 F.3d 572 (11th Cir.1995), that we will affirm an order of restitution only if the record reveals that the district court considered the defendant's ability to pay prior to imposing the amount of restitution. *Id.* at 574. The fact that the defendant bears the burden of proving his or her financial ability, 18 U.S.C. § 3664(d), does not diminish the district court's duty in this respect. We recognize that *Remillong* was decided after the district court had sentenced the defendants, but under *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), *Remillong* is applicable to this case.

At the sentencing hearings, the district court imposed restitution of $106,000 on McKnight and the other defendants without considering any of the defendants' abilities to pay. (*See*

*e.g.* Sentencing Hearing of Seeta McKnight, May 14, 1993, at 20).

With respect to McKnight, the court had earlier adopted the findings and conclusions of the Presentence Investigation Report (the "PSR") in all respects. *Id.* at 2. The PSR concluded that McKnight "will be unable to make a lump sum fine or restitution payment," but that she "should be able to make periodic payments from income from work in prison industries or from income from legitimate employment while on Supervised Release." (PSR of Seeta McKnight at 15). However, the wholesale adoption of the PSR at the commencement of the sentencing hearing, without more, does not suffice to meet the court's obligation under 18 U.S.C. § 3664(a) and under *Remillong* to consider a defendant's financial resources before imposing restitution. The PSR's findings do not take into consideration the objections to the PSR or the arguments made by both parties during the sentencing hearing. Nor did the district court reaffirm its adoption of the PSR's findings after all arguments had been heard and before it imposed restitution on McKnight.

The district court did not consider the financial abilities of Page, Rogers, or Scalise at all. With respect to Jackson, the court found that she "certainly cannot pay all this restitution" but nonetheless imposed restitution for the full $106,000 on her. (Transcript of Sentencing Hearing of Mary Jackson, May 14, 1993, at 23).

Therefore, we instruct the district court, when it resentences the defendants in conjunction with its *Jones* inquiries, to consider each defendant's ability to pay, pursuant to *Remillong,* before

imposing a restitution amount.

C.

Moreover the district court, on remand, will be obliged to clarify the joint and several nature of its restitution order. When sentenced, all of the defendants were required, jointly and severally, to pay restitution in the amount of $106,000. Yet the sentences of McKnight, Rogers, and Scalise also provided: "[t]he defendant's restitution obligations shall not be affected by any restitution payments that may be made by other defendants in this case." (*See e.g.* Judgment and Commitment of Seeta McKnight at 4).[10]

Because of the joint and several nature of the restitution imposed by the district court, the district court could not at the same time also provide that the monies paid by one defendant could not be credited toward the restitution obligations of the other defendants.

While we do not preclude a joint and several restitution order under appropriate circumstances where the district court has complied with our mandates on sentencing, *see e.g.,* the requirements of *Jones* and *Remillong,* we do not encourage such a joint and several provision particularly where differences may appear in the ability of various defendants to respond to the overall restitution ordered.

---

[10]The sentences of Page and Jackson did not include this language. (Judgment and Commitment of Edsel Page at 4); (Judgment and Commitment of Mary Jackson at 4). However, during Jackson's sentencing hearing, the district stated that Jackson's obligation to make restitution shall not be affected by the restitution payments made by the other defendants until full restitution has been made. (Transcript of Sentencing Hearing of Mary Jackson, May 14, 1993, at 32).

In this particular case, if the district court decides to reinstate the joint and several provision in its order, it cannot provide that "[t]he defendant's restitution obligations shall not be affected by any restitution payments that may be made by other defendants in this case," inasmuch as the two concepts are mutually exclusive. Five defendants cannot be ordered as a group to pay what amounts to five times the amount of loss suffered by the victims.

It may be that the district court, after considering each defendant's financial ability pursuant to *Remillong,* will find that each defendant can bear the whole restitution amount of $106,000, in which case a joint and several order may be appropriate. If it does not so find, however, it would appear that restitution should be ordered, if at all, only in accordance with each defendant's financial ability.[11]

V.

In addition to the "vulnerable victim" and restitution issues,

---

[11]Finally, the district court should also clarify and correct the sentences of McKnight and Jackson with respect to the statement of the total amount of restitution owed. Currently, those sentences provide that the defendants shall make restitution of $250 "to each of the 453 victims identified by the Postal Inspector." (*See e.g.* Judgment and Commitment of Seeta McKnight at 4). On its face, this statement is inconsistent with the later provision, found in the same Judgment, that states: "[t]he total amount of restitution ordered is $106,000." The calculation which results from multiplying 453 victims by $250 is $113,250.

It is evident from the record that the district court intended to impose a restitution amount of no more than $106,000 on each of the defendants. (*See* Transcript of Sentencing Hearing of Mary Jackson, May 14, 1993, at 35). If, on remand, the district court intends some other restitution, it is free to order it, if supported by the record.

the various defendants raised the following issues on appeal:

Page contested the admission of similar act evidence at trial and argued that his sentence should have been reduced for a minor role. He also appealed the district court's denial of his motion for acquittal and the district court's denial of his motion to dismiss those counts of the indictment that were based on the conspiracy's activities after his departure.

Jackson contended that she was not afforded pretrial notice with respect to certain similar act evidence and also contested the admission in general of all similar act evidence against her. She also argued that her sentence should have been reduced based on her minor role.

Rogers contested the admission of similar act evidence at trial and argued that her sentence should have been reduced based on her minor role.

Scalise argued that his sentence should have been reduced based on his minor role.

We have reviewed all of the defendants' contentions and have considered all of the remaining grounds on which defendants challenge their convictions and sentences on appeal, and we find them to be without merit.

## VI.

We will VACATE and REMAND the sentences of all of the defendants and instruct the district court to resentence each of these defendants pursuant to the requirements of *United States v. Jones,* 899 F.2d 1097 (11th Cir.1990), *United States v. Remillong,* 55 F.3d 572, 574 (11th Cir.1995), and this opinion.

In particular, after the district court has conducted its inquiries as required by *Jones* and *Remillong,* and after it has resentenced the defendants as to restitution, it need not revisit the other sentencing issues which we have affirmed in this opinion. Thus, issues concerning minor role and "victim vulnerability," having been decided in this opinion, will not be available to be raised by the defendants as objections under *Jones.*

We will AFFIRM the judgments and sentences imposed by the district court in all other respects.