United States Court of Appeals, Eleventh Circuit.

No. 94-5344

Non-Argument Calendar.

UNITED STATES of America, Plaintiff-Appellee,

v.

Antonio ARGUEDAS, Defendant-Appellant.

July 1, 1996.

Appeal from the United States District Court for the Southern District of Florida. (No. 94-237-CR-SM), Stanley Marcus, Judge.

Before ANDERSON, BIRCH and CARNES, Circuit Judges.

CARNES, Circuit Judge:

Antonio Arguedas was charged in a 20-count indictment with conspiracy to commit mail fraud, wire fraud, interstate transportation of stolen property, and money laundering, for his role in a fraud scheme involving two Miami, Florida churches. Prior to trial, Arguedas pleaded guilty to all counts. The district court sentenced him to two 108 month terms of imprisonment, and a term of 60 months imprisonment, all of which are to be served concurrently. The court also ordered that the imprisonment was to be followed by a three-year term of supervised release, and ordered restitution in the amount of $125,457.00.

Arguedas appeals his sentence, contending that the district court erred by: (1) enhancing his sentence based on a finding that Arguedas targeted "vulnerable victims"; (2) enhancing his sentence for obstruction of justice; and (3) refusing to reduce his sentence for acceptance of responsibility after he pleaded guilty on all counts. For the reasons discussed below, we affirm Arguedas's sentence.

## I. BACKGROUND

A. Facts

In 1991, Antonio Arguedas and his wife had known the Reverend Francisco Ramos, pastor of Iglesia Betania, a Miami church, for several years. They had developed a fairly close personal relationship. Knowing that Ramos's wife needed open heart surgery, Arguedas's wife posed as a cardiologist, in an effort to nurture the trusting relationship between the two couples. Arguedas's wife promised that she could take care of the surgery free of cost.

In late 1991, Arguedas and his wife invited Ramos and his family to visit them at their home in Delaware. Arguedas asked Ramos about the financial condition of Iglesia Betania Church and inquired whether the church was a tax-exempt organization under the Internal Revenue Code. Arguedas advised Ramos that he would apply for tax-exempt status for the church. In the course of doing this "favor" for Ramos, Arguedas convinced Ramos that his church owed approximately $20,000 in back taxes because it was not tax-exempt. Arguedas put Ramos on the telephone with codefendant Jim Estrada, who posed as an IRS employee. Estrada convinced Ramos to give Arguedas $6,452.61 to pay the back taxes, a reduced amount that Estrada said the IRS would accept because of Estrada's friendship with Arguedas. Arguedas also convinced Ramos to incorporate his church in Delaware and to pay Arguedas the fees and expenses he said were associated with the transfer of the incorporation.

In September 1992, Arguedas told Ramos that he had learned of a program known as the "Pro Religion Development Fund," which he said was sponsored and operated by the United States Department of

State.  Arguedas told Ramos that the fund provided multi-million dollar grants to churches for charitable purposes and that once Iglesia Betania Church had received its tax-exempt status and had paid certain fees, the church would be eligible to receive a $1.5 million grant.  Over the next few months, Arguedas provided documentation to Ramos, including correspondence purporting to be between Arguedas and the president of the fund.

Arguedas initially convinced Ramos and board members of the church to pay $25,000 toward the fund application.  In December 1992, after Arguedas convinced Ramos and church members that the church would be entitled to an increased grant of $3 million, the church paid Arguedas an additional $35,000 toward their application.  Arguedas even introduced Ramos to a church builder who discussed designs for a new church, which was to be built with the proceeds of the fund.

Throughout 1993, Arguedas had various telephone conversations with Ramos, during which Arguedas asked for additional monies in increments of $4,000 to $5,000, which he said were to pay for legal fees, closing costs, and other expenses association with the grant. In all, Ramos's church paid approximately $100,000 to Arguedas during the fraud scheme.

In September of 1993, while the scheme was ongoing and Ramos was expecting his $3 million grant, Arguedas asked Ramos to recommend other churches that might be good candidates to receive similar grants from the Pro Religion Development Fund.  Ramos recommended the Iglesia Cristiana Church, in Miami.  Arguedas met with Reverend Perez, the pastor of that church, in October 1993 and

discussed a $500,000 grant for the church, which later was increased to approximately $1 million. In October and December 1993, Perez sent Arguedas two checks, totalling $25,000, as payment toward the grant application. From January to May 1994, Arguedas and other codefendants had additional telephone conversations with Perez concerning additional monies which would have to be paid to obtain the grant. Of course, neither church ever received any grant money.

B. Pre-Sentencing Investigation Report

Arguedas pleaded guilty to the scheme discussed above. A Pre-Sentencing Investigation Report was prepared. Both the government and Arguedas filed objections to the PSI. Arguedas objected that he was entitled to a reduction in offense level based upon his acceptance of responsibility, because he had made a written statement of contrition to the probation officer (after the PSI had been prepared).

The government objected that Arguedas should receive a two-level upward adjustment, under the United States Sentencing Guidelines § 3A1.1 for targeting an unusually vulnerable or susceptible victim. The government also objected that Arguedas should receive a two-level upward adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1 (1994). Finally, the government objected that Arguedas was not entitled to a three-level reduction for acceptance of responsibility, under U.S.S.G. § 3E1.1 (1994), because, although Arguedas pleaded guilty, he never fully admitted his culpability and also had obstructed justice.

In response to Arguedas's objection, the probation officer

decided that his initial position had been correct: Arguedas was not entitled to an acceptance of responsibility reduction. In response to the government's objections, the probation officer changed some of the initial PSI recommendations. He agreed that the victims were unusually vulnerable or susceptible so that Arguedas's offense level should be enhanced by two levels for that reason. The probation officer also agreed with the government that Arguedas had obstructed justice by providing numerous written proffers after his plea directed at falsely exculpating his codefendants. As a result, he determined that Arguedas's offense level should be enhanced by two levels for obstruction of justice.

C. Sentencing Hearing

At the sentencing hearing, Arguedas contended that he should not receive a two-level upward adjustment for targeting vulnerable victims, arguing that his victims were not particularly vulnerable and that his scheme was "just a run of the mill fraud." The district court disagreed, stating, "I see this as a profoundly egregious fraud...." The court found that Arguedas "did, indeed, nurture a close relationship with the pastor and his wife." The court also found that:

> Reverend Ramos was plainly inexperienced in matters of financial affairs and tax matters, and, indeed the church was particularly vulnerable in terms of financial wherewithal of the church. And I think the defendant plainly played on his knowledge of the victims' weaknesses, plainly played on the knowledge that they were unusually vulnerable ... because of their role in the church and the relationship that had been engendered.

With that explanation, the district court applied the vulnerable victim enhancement.

The government then asked the district court for a two-level

upward adjustment based on Arguedas's obstruction of justice, pointing out that, after Arguedas had pleaded guilty, he had made several contradictory statements to law enforcement officers. Arguedas had attempted to falsely exonerate codefendant Smith, or at least play down Smith's involvement; and Arguedas had falsely stated that his wife was innocent.

In response, Arguedas denied that his false statements had impeded the government's investigation. His attorney explained that Arguedas "initially may have attempted to mitigate his wife's circumstances. He was torn between love for wife and his own responsibilities...." The district court found that Arguedas had obstructed justice, and accordingly enhanced his sentence two levels. The court remarked: "There is no question in this record ... that the defendant's account has changed like the wind," and concluded, "I am convinced that [Arguedas] lied to me in this courtroom and that he provided materially false information to a Judge or Magistrate."

Arguedas contended that he was entitled to a two- or three-level reduction for acceptance of responsibility, because he had pleaded guilty and had accepted responsibility for his acts. The government opposed the reduction because of Arguedas's obstruction of justice. The district court concluded that, because of his obstruction, Arguedas had not accepted responsibility and was not entitled to the reduction.

## II. DISCUSSION

A. The Vulnerable Victim Adjustment

Section 3A1.1 of the Sentencing Guidelines provides for a

two-level upward adjustment to a defendant's offense level:

> If the defendant knew or should have know that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct.

U.S.S.G. § 3A1.1 (1994).

The district court adjusted Arguedas's offense level based on its finding that Reverend Ramos was particularly susceptible to Arguedas's fraud scheme. The district court's application of section 3A1.1 presents a mixed question of law and fact, which we review *de novo*. *United States v. Thomas,* 62 F.3d 1332, 1344 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1058, 134 L.Ed.2d 202 (1996). The district court's determination of a victim's "vulnerability" is, however, essentially a factual finding to which we give due deference. *United States v. Page,* 69 F.3d 482, 488 (11th Cir.1995); *United States v. Salemi,* 26 F.3d 1084, 1087 (11th Cir.1994) ("The determination of vulnerability is a factual finding which is entitled to due deference on review." (citation omitted)), *cert. denied,* --- U.S. ----, 115 S.Ct. 612, 130 L.Ed.2d 521 (1994); 18 U.S.C. § 3742(e) ("The court of appeals ... shall give due deference to the district court's application of the guidelines to the facts.").

The "vulnerable victim" adjustment should be applied only in cases in which the defendant selects his victim due to the defendant's perception of the victim's vulnerability to the offense. *Page,* 69 F.3d at 488. In *United States v. Long,* 935 F.2d 1207, 1210 (11th Cir.1991), we stated that, "[t]he applicability of section 3A1.1 turns on the defendant's decision to target the victim." "[T]o determine whether defendants have targeted

"vulnerable victims,' we look to the facts known to defendants when they decided to target the victims." *Page,* 69 F.3d at 489 (citation and internal quotation marks omitted).

In enhancing Arguedas's sentence for targeting a vulnerable victim, the district court looked to the fact that Arguedas had engendered a personal relationship with Ramos, and had gained particular knowledge of Ramos's financial situation. Arguedas targeted Ramos as his victim, worked to learn more about Ramos's particular susceptibility, and then acted upon that knowledge to defraud Ramos and his church.

The record reflects that Arguedas befriended and later targeted Reverend Ramos, a relatively unsophisticated pastor of a financially-strapped church. Arguedas relied upon his personal friendship with Ramos, as well as Ramos's religious and trusting nature, to perpetrate his fraud scheme. Arguedas even had his wife pose as a cardiologist offering to provide free medical care to Ramos's sick wife as an additional means of eliciting Ramos's trust while he defrauded Ramos and his church. But, in this case we need not decide whether those circumstances alone would justify a vulnerable victim enhancement, because there is an alternative ground for the enhancement. Arguedas, by convincing Ramos to apply for tax-exempt status, gained access to all relevant financial information concerning Ramos's church. With that financial information, Arguedas became aware of the church's particular vulnerability due to its precarious financial situation.

We have held that "being in a precarious financial situation is a "vulnerability' to fraudulent financial solicitations such as

... advance fee loan scheme[s]." *Page,* 69 F.3d at 489. A victim's vulnerable financial situation may alone serve as the basis of a section 3A1.1 enhancement, if the defendant targeted the victim for that reason. *Id.; see also United States v. Borst,* 62 F.3d 43, 46-47 (2d Cir.1995) (victims' financial situation and defendant's access to their financial records made them especially vulnerable and enabled defendant to commit crimes for which he was convicted because they were willing to overlook defendant's suspect business practice).

Arguedas's fraud scheme was not aimed at the general public, but instead Arguedas targeted Ramos because Arguedas believed him to be particularly vulnerable. *See Page,* 69 F.3d at 490 (discussing advance fee loan scheme that addressed itself to persons with bad credit). Further, even if Arguedas did not initially know of Ramos's vulnerability, he warrants a section 3A1.1 enhancement because he learned of the vulnerability during the course of the loan fraud and thereafter continued to perpetrate the fraud against Ramos. *See id.* "[W]here the "thrust of the wrongdoing' [is] continuing in nature, the defendants' attempt to exploit the victim's vulnerability will result in an enhancement even if that vulnerability did not exist at the time the defendant initially targeted the victim." *United States v. Thomas,* 62 F.3d 1332, 1345 (11th Cir.1995).

When Arguedas targeted Ramos and his church, knowing of their precarious financial situation, he targeted vulnerable victims. Under our *Page* decision, that alone justifies the sentencing enhancement. Therefore, we need not consider whether Arguedas's

personal relationship with his victim justifies the vulnerable victim enhancement.

B. The Obstruction of Justice Adjustment

Section 3C1.1 of the Sentencing Guidelines provides for a two-level upward adjustment to a defendant's offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense...." U.S.S.G. § 3C1.1 (1994). Examples of such conduct include providing materially false statements to a judge, or to a law enforcement officer, that significantly obstruct or impede the official investigation or prosecution of the offense. U.S.S.G. § 3C1.1 (1994), comment. (n. 3(f), (g), (h)).

This Court reviews the district court's factual finding that a defendant obstructed justice only for clear error. *United States v. Bagwell,* 30 F.3d 1454, 1458 (11th Cir.1994). We review the district court's application of the Guidelines to that factual finding *de novo. Id.* Although it is preferable that the district court make specific findings as to each alleged instance of obstruction by identifying the materially false statements individually, *United States v. Dunnigan,* 507 U.S. 87, 95, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993), it is sufficient if the court makes a general finding of obstruction of justice that encompasses all of the factual predicates of perjury, *id.; see also United States v. Dobbs,* 11 F.3d 152, 154-55 (11th Cir.1994).

In *Dunnigan,* the district court had not identified specific instances of obstruction. The court had, however, stated that:

> the defendant was untruthful at trial with respect to material matters in this case. [B]y virtue of her failure to give truthful testimony on material matters that were designed to substantially affect the outcome of the case, the court concludes that the false testimony at trial warrants an upward adjustment....

507 U.S. at 95, 113 S.Ct. at 1117 (alteration in original). The Supreme Court upheld the district court's sentence because the record amply demonstrated that the defendant's testimony was materially false, and therefore supported the court's general finding. *Id.*

In this case, the district court's statements were at least as specific as those in *Dunnigan.* The district court here stated:

> I am quite convinced that [Arguedas] provided materially false statements to law enforcement agents. I am convinced that it impeded their investigation. Beyond that, I am convinced that he lied to me in this courtroom and that he provided materially false information to a judge or magistrate.... I believe there was not only an obstruction, but there was plainly a repeated attempt to obstruct both the investigation and prosecution of this case.

The record reflects that Arguedas made contradictory statements regarding the identity and whereabouts of his codefendants, and his role and the role of his codefendants in the fraud scheme. For example, at his plea hearing, Arguedas agreed that the government accurately stated that his codefendant Estrada assisted in the scheme. However, in an interview with a federal agent immediately after his plea hearing, Arguedas stated that he himself played the role of Estrada. Arguedas also stated in that interview that his codefendant Smith had no knowledge of the fraud scheme. Yet in his proffer, Arguedas stated that he paid Smith $1,000 for his part in the scheme. The record supports the district court's finding that Arguedas obstructed justice by making

materially false statements during the course of his investigation and prosecution.

C. The Acceptance of Responsibility Adjustment

Section 3E1.1 of the Sentencing Guidelines provides for up to a three-level downward adjustment to a defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense" by assisting authorities in the investigation or prosecution of his own misconduct by timely providing complete information to the government or by timely notifying authorities of his intention to enter a plea of guilty. U.S.S.G. § 3E1.1 (1994). This Court reviews the district court's determination of acceptance of responsibility only for clear error. *United States v. Anderson,* 23 F.3d 368, 369 (11th Cir.1994).

Arguedas contends that he was entitled to a three-level downward adjustment to his offense level because he entered a guilty plea and accepted full responsibility for his acts. "An adjustment ... for acceptance of responsibility is not warranted when a defendant's conduct results in an enhancement for obstruction of justice." *United States v. Kramer,* 943 F.2d 1543, 1547 n. 4 (11th Cir.1991) (citing U.S.S.G. § 3E1.1, Application Note 4), *cert. denied,* 506 U.S. 818, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992). Although Arguedas did plead guilty, he repeatedly made materially false statements to the authorities and to the district court. The district court found that Arguedas's misstatements impeded the investigation and prosecution of his offenses and, accordingly, it enhanced Arguedas's sentence for obstruction of justice. Imposition of that enhancement was not clearly erroneous.

AFFIRMED.