UNITED STATES of America, Plaintiff–Appellee,

v.

Patricia DAVIS, Defendant–Appellant.

No. 90–7108.

United States Court of Appeals, Eleventh Circuit.

Aug. 3, 1992.

J. Stephen Salter, Kimberly R. West, Birmingham, Ala., for defendant-appellant.

Frank W. Donaldson, U.S. Atty., James E. Phillips, John C. Earnest, Jr., Asst. U.S. Attys., Birmingham, Ala., for plaintiff-appellee.

Before KRAVITCH and EDMONDSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Patricia Davis was one of several Alabama legislators investigated for taking bribes. She was convicted by a jury of four counts of violating the Hobbs Act, 18 U.S.C. § 1951. She appeals the district court's failure to grant her a continuance before trial, the jury instructions, and the calculation of her sentence under the federal sentencing guidelines. We affirm the district court on all issues except one aspect of sentencing, for which we remand for further proceedings.

## I—BACKGROUND AND COURSE OF PROCEEDINGS

Davis was a member of the Alabama House of Representatives and chaired the Public Utilities and Transportation Committee. Her co-defendants, John W. Rogers, Jr. and Jim Wright, were also representatives on the committee. One of the bills they considered was the Buy Alabama Coal Bill, which originally was introduced and assigned to the committee during the 1987 legislative session. The proposed bill required Alabama public utilities to buy coal mined in Alabama unless the same quality coal could be bought out-of-state for a lower price, and it forbade state-owned buildings and facilities from using coal from outside the United States. Representative Thomas Hogan, who had introduced the bill but was not on the committee, requested action on the bill, but the committee did not vote on it during the 1987 legislative session.

Hogan reintroduced the bill in 1988, and the committee held a public hearing on it on February 24, 1988. John W. Stewart, President of United Mine Worker's Local No. 1928, was in the gallery that day. He had come to Montgomery with other miners to lobby for the bill. His only prior contact with Davis was at a political gathering in 1987 when he had asked Davis to support the predecessor coal bill then before her committee. At the public hearing, after speeches for and against, the bill was voted down 8–4 with Rogers voting against and Davis not voting. After the meeting was adjourned, Stewart met with Davis at her request in her office. She first stated that she had never seen a bill so soundly defeated and told Stewart that the Ala-

bama Power Company had spent $100,000 to $200,000 to ensure that result. She then handed Stewart a piece of paper with the figure $25,000 written on it and said she could get the coal bill reported out of committee for that amount. Stewart responded that he would try to oblige, and he left the meeting with the impression that Davis expected cash payments for herself and other committee members (specifically Wright and Rogers) in exchange for favorable action on the bill.

In June 1988, Stewart approached the U.S. Attorney's Office about this activity and agreed to cooperate with them by participating in future transactions and recording them on audio and video tape. Over the next sixteen months, Stewart met several times with Davis and gave her cash payments.[1] Meanwhile the coal bill was revived. Davis introduced a new version of it in August 1988, and in March 1989 the Public Utilities and Transportation Committee approved it 4–2 with Davis and Wright supporting it and Rogers abstaining. In April, after protest that the vote had occurred without a quorum present, the committee reconsidered the bill and voted it down 8–4, although Davis and Wright still voted for it and Rogers again abstained. Davis reintroduced a version of the bill later that month and it went no further during the 1989 legislative session. In October 1989, after the government had obtained wiretap evidence and collected the Stewart tapes, a grand jury in the Northern District of Alabama indicted Davis, Rogers, and Wright for ten counts of conspiring to commit extortion under the Hobbs Act. Davis was found guilty on four Hobbs Act counts. She was acquitted, along with Rogers and Wright, of the remaining charges. After a sentencing hearing, Davis received seventy-eight months in prison for each count, supervised release and fines of $77,000. She appeals both her conviction and sentence.

1. Four payments totalling $19,200 were the basis of the four counts of which Davis was found guilty, although the government alleged more. *See infra* n. 3.

## II—DISCUSSION

### A. CONTINUANCE

■ The time between the indictment and the beginning of trial was two months: October 6 to December 4, 1989. Appellant argued that was insufficient time to prepare a defense to a case involving forty to fifty hours of audio tapes and 750 wiretapped telephone conversations, the testimony of thirty witnesses and 300 subpoenaed documents. She appeals the district court's final order denying the continuance, which we review for abuse of discretion and which appellant must show resulted in specific substantial prejudice. *See United States v. Bergouignan,* 764 F.2d 1503, 1508 (11th Cir.1985), *cert. denied,* 484 U.S. 1044, 108 S.Ct. 778, 98 L.Ed.2d 864 (1988); *United States v. Garmany,* 762 F.2d 929, 936 (11th Cir.1985), *cert. denied,* 474 U.S. 1062, 106 S.Ct. 811, 88 L.Ed.2d 785 (1986); *United States v. Smith,* 757 F.2d 1161, 1166 (11th Cir.1985). Several factors are relevant in assessing claims of inadequate preparation time, including: the amount of time, the likelihood of prejudice, the accused's role in shortening the time period, the degree of complexity of the case, and the availability of discovery from the prosecution. *See Garmany,* 762 F.2d at 936 (quoting *United States v. Uptain,* 531 F.2d 1281, 1286 (5th Cir.1976)[2]).

In this case the district court did not abuse its discretion by denying appellant's motion for a continuance. Although there was extensive discovery, the government's tapes along with the relevant transcripts and indices were available for most of the pretrial period. *See* Magistrate Judge's Order of Nov. 24, 1989, at 7. In addition, the district court wanted to try the case before the beginning of the 1990 legislative session to allow Alabama legislators to testify and to advance the public's interest in a prompt trial of its elected officials. *Id.* at 5–6, 9. Most important, appellant has

2. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

failed to show how additional time would have aided her defense and how she was specifically prejudiced by the court's failure to grant a continuance. *See United States v. Medina–Arellano*, 569 F.2d 349, 355–56 (5th Cir.1978); *cf. United States v. Darby*, 744 F.2d 1508, 1522 (11th Cir.1984) (one month for preparation of complex criminal trial not prejudicial), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985).

## B. JURY INSTRUCTIONS

Appellant raises three objections to the Hobbs Act jury instructions: 1) failure to adequately instruct that defendant "induced" the cash payments, 2) failure to instruct that a quid pro quo was an element of the offense, and 3) improper instruction on the jurisdictional requirement of interstate commerce. We reject appellant's contentions on each of these issues.

### i. Inducement

The Hobbs Act, 18 U.S.C. § 1951, reads in pertinent part:

§ 1951. **Interference with commerce by threats or violence**

(a) Whoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, **induced** by wrongful use of actual or threatened force, violence, or fear, or **under color of official right.** [emphasis added].

In its jury instructions the district court charged that for a guilty verdict the jury was required to find that "the defendant on or about the date set forth, either induced or attempted to induce John W. Stewart to part with money" and "did so knowingly and willfully by means of extortion or attempted extortion under color of official right." R17–1686–87. The judge also instructed:

The central inquiry is whether the public officer, by the use of his or her public office, willfully caused or induced, or attempted to cause or induce the person to give him or her money, whether that money is called a campaign contribution, a personal gift, a reimbursement for expenses or for other purposes.

*Id.* at 1688. According to appellant, the charges given did not adequately reflect the statutory requirement that appellant "induced" the cash payments. Appellant claims that she merely accepted Stewart's advances and did not initiate or induce the payments except to continue in her service as a state legislator.

The Supreme Court's recent decision in *United States v. Evans*, — U.S. —, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), is dispositive of this claim. In *Evans*, the Court, affirming this court,[3] held that the Hobbs Act does not require an affirmative act of inducement by a public official to prove extortion under color of official right. The Court based its decision on its conclusions that the Hobbs Act incorporated the common-law definition of extortion, and that "a demand, or request, by the public official was not an element of the [common law] offense." *Evans*, — U.S. at —, 112 S.Ct. at 1885. Rather, "extortion by the public official was the rough equivalent of what we would now describe as taking a bribe." *Id.* In so interpreting the Hobbs Act, the Court gave credence to this court's statement in *Evans* that:

passive acceptance of a benefit by a public official *is* sufficient to form the basis of a Hobbs Act violation if the official knows that he is being offered the payment in exchange for a specific requested exercise of his official power. The official need not take any specific action to induce the offering of the benefit.

*Evans*, 910 F.2d at 796 (emphasis in original).

---

**3.** *United States v. Evans*, 910 F.2d 790 (11th Cir.1990).

The district court properly instructed the jury by hewing closely to the statute's requirements and by focusing on the manner in which Representative Davis' official position itself provided Stewart with the necessary inducement. No overt act of inducement was required because the four counts from which appellant appeals all involved payments for expected or recently completed legislative efforts on behalf of the coal bill.[4] Further, even if an overt act of inducement were required, the failure to so instruct would be harmless error because Davis took the initiative in setting up the arrangement of cash for votes and demanded new payments at several points during the bill's tortuous journey.

### ii. Quid Pro Quo

■ Appellant's argument that a specific quid pro quo is required by the statutory language "under color of official right" is related but potentially distinct from the inducement argument. While inducement involves the question of who initiated the extortion, the quid pro quo inquiry is whether the link between extorted property and official power is sufficiently specific. In this case, the quid pro quo refers to whether the money was designated for particular acts or promises to act by Davis.

Appellant claims a single passage in *United States v. Haimowitz* requires a quid pro quo in this circuit. *See United States v. Haimowitz*, 725 F.2d 1561, 1573 (11th Cir. 1984) ("there was no proof that this demand was coupled with a promise by Scarborough to perform some act of official grace. *See United States v. Dozier*, 672 F.2d 531, 537 (5th Cir.), *cert. denied*, 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982)"), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984).

The Supreme Court addressed the quid pro quo issue in *McCormick v. United States*, —— U.S. ——, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). In *McCormick*, a member of the West Virginia House of Delegates was prosecuted under the Hobbs Act for extorting payments in connection with his support during his 1984 reelection campaign for legislation to aid unlicensed doctors. The district court instructed the jury that a specific quid pro quo was not required.[5] Upon the jury's request for clarification on the extortion definition, the district court repeated its instructions and added that extortion does not include a legitimate gift or a voluntary political contribution, that is, one freely given without expectation of benefit.[6] The jury convicted

---

**4.** The guilty verdicts were for counts II, IV, VII and VIII. Count II involved a $12,000 payment after a discussion of how to get the bill reported out of the committee. At the meeting involving Count IV, Davis had recently reintroduced the coal bill, Stewart paid her $1,200 for hotel bills and Davis stated that there was a chance the coal bill would pass in the regular legislative session. Count VII involved a $1,000 "token of appreciation" after Davis described her efforts to get support for the bill from other committee members and called several of them by phone with Stewart present. Count VIII involved a $5,000 payment for Davis to reintroduce the bill after it had been approved and then rejected by the committee.

**5.** The district court stated:

"It is not necessary that the government prove in this case that the defendant misused his public office in the sense that he granted some benefit or advantage to the person or persons, here the unlicensed doctors, who allegedly paid him money. Though the unlicensed doctors may have gotten no more than their due in the defendant's performance of his official duties, the defendant's receipt of

money, if you find that to have occurred, for the performance of such acts is a misuse of office. When a public official accepts the payment for an implicit promise of fair treatment, if any such promise there were, there is an inherent threat that without the payment, the public official would exercise his discretion in an adverse manner.

. . . .

So it is not necessary that the government prove that the defendant committed or promised to commit a quid pro quo, that is, consideration in the nature of official action in return for the payment of the money not lawfully owed. Such a quid pro quo may, of course, be forthcoming in an extortion case or it may not. In either event it is not an essential element of the crime."

*McCormick*, —— U.S. at —— n. 4, 111 S.Ct. at 1812 n. 4 (quoting district court).

**6.** The exact language was:

"Extortion under color of official right means the obtaining of money by a public official when the money obtained was not lawfully due and owing to him or to his office. Of course, extortion does not occur where one

and the Fourth Circuit Court of Appeals affirmed. The Supreme Court reversed, however, and stated that when an official receives campaign contributions, the prosecution for Hobbs Act extortion involving such payments requires proof of a quid pro quo. Extortion under color of official right is made out "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at ——, 111 S.Ct. at 1816. The Court noted that the jury instruction on "voluntary campaign contributions," quoted *supra* n. 6, was error because it stated that "voluntary" meant free from expectation of benefit. By this definition, the Court reasoned, the trial court was allowing the jury to convict for legitimate campaign contributions, which often involve the expectation of benefit.[7] Indeed, the fear that routine political service to constituents could be the basis for convictions under the Hobbs Act when linked to campaign contributions appeared to. be a major concern of the Court in reversing the decision of the Fourth Circuit. *Id.* at ——, 111 S.Ct. at 1816 (such conduct "unavoidable" in present political system). The Court was also careful to note that it was not deciding a rule applicable to payments that were *not* campaign contributions, such as "gifts, meals, travel expenses, or other items of value." *Id.* at —— n. 10, 111 S.Ct. at 1817 n. 10.

In this case, the district court gave a quid pro quo instruction similar to that in *McCormick.* It stated:

> The taking or offering to take or agreeing to take or withhold official action for the money is sometimes referred to as a quid pro quo, that is, something for something. But a specific quid pro quo is not always necessary for a public official to be guilty of extortion. The central inquiry is whether the public officer by the use of his or her public office willfully caused or induced or attempted to cause or induce the person to give him or her money, whether that money is called a campaign contribution, a personal gift, a reimbursement for expenses, or for other purposes. It is in final analysis, the willful use of the power of the public office itself to procure the money—to procure the payment of money not owed to the public official or his office that constitutes the offense.

R17–1688. We note that the district court stated a quid pro quo was not *always* necessary, indicating that sometimes it may be. More importantly, the district court further instructed the jury to distinguish extortion from legitimate campaign contributions:

> Politicians most often receive and indeed actively solicit campaign contributions. This activity is commonplace; and as related to this case, there is nothing wrong with soliciting or attempting to solicit a campaign contribution, whether in the form of check or cash, provided that the campaign contribution is not extorted or the politician is not attempting to extort the campaign contribution. Stated another way, money paid or received as a political contribution can be extorted by a public official in the same manner as any other money paid or received, such as money paid for hotel expenses, travel expenses, and entertainment expenses, personal expenses, or for delivery to other persons for similar reasons. The label or name given to the payment while significant is not controlling. Thus if a public official willfully misuses his or her

---

who is a public official receives a legitimate gift or a voluntary political contribution even though the political contribution may have been made in cash in violation of local law. *Voluntary is that which is freely given without expectation of benefit."* *Id.* at ——, 111 S.Ct. at 1812 (quoting district court) (emphasis added).

**7.** "[T]he jury was told that it could find McCormick guilty of extortion if any of the payments, even though a campaign contribution, was made by the doctors with the expectation that McCormick's official action would be influenced for their benefit and that McCormick knew that the payment was made with that expectation." *Id.* at ——, 111 S.Ct. at 1817. The Court remanded for a new trial because the jury *could* have convicted McCormick on this basis, although it is not certain given the general verdict that it actually did so and although the dissent maintained that any error in the instruction was harmless. *Id.* at ——, 111 S.Ct. at 1817–18.

office by taking or offering to take or agreeing to take or withhold official action for the wrongful purpose of causing or inducing a person to part with money, even money that is denominated and reported as a campaign contribution or denominated as a personal gift or reimbursement for expenses, such action by the public official would constitute extortion or attempted extortion; and this is true even though the official was already duty bound to take or withhold the action in question.

*Id.* at 1687–88. Unlike in *McCormick,* the jury was not left with the impression that it could convict for legitimate political activity. There was no instruction implying that monetary contributions accompanied with the expectation of a benefit were not "voluntary" and thus subject to Hobbs Act prosecution. Such an implication was the primary flaw in the *McCormick* instructions. *See McCormick,* —— U.S. at ——, 111 S.Ct. at 1817. In addition, the jury in this case was instructed that misuse of office "by taking or offering to take or agreeing to take or withhold official action" constituted an offense. This language is near enough to the "explicit promise or undertaking by the official to perform or not to perform an official act" outlined in *McCormick* that we cannot say the jury was misled.

### iii. Interstate Commerce

██ Finally, we find no merit in appellant's argument that the trial court erred in its instruction on the Hobbs Act jurisdictional requirement that extortions or attempted extortions affect interstate commerce. We have held that the government need only show a minimal effect on interstate commerce to sustain jurisdiction under the Hobbs Act. *See United States v. Alexander,* 850 F.2d 1500, 1503 (11th Cir. 1988), *modified on other grounds,* 888 F.2d 777 (1989). The district court charged the jury:

While it is not necessary to prove that the defendant specifically intended to interfere with interstate commerce, it is necessary concerning this issue that the government prove that the natural conse-

quences of the acts alleged in the indictment would be to delay, interrupt or adversely affect "interstate commerce," which means the flow of commerce or business activities between two or more states. You are instructed that you may find that the requisite effect upon interstate commerce has been proved if you find beyond a reasonable doubt that the alleged activity or conduct of the defendant concerned the enactment into law of a legislative bill pending in the Alabama House of Representatives commonly known as the "Buy Alabama Coal Bill" which, among other things, sought to give a preference for the purchase of coal mined in Alabama over out-of-state or foreign coal.

Jury instructions at 4. As appellee points out, Davis extorted money based upon her potential to affect a bill that by definition affected interstate commerce, even though the bill never passed. The potential impact on interstate commerce is measured at the time when the extortion demand was made based on the assumed success of the intended scheme. *See United States v. Farrell,* 877 F.2d 870, 875 (11th Cir.), *cert. denied,* 493 U.S. 922, 110 S.Ct. 289, 107 L.Ed.2d 268 (1989); *United States v. McKenna,* 889 F.2d 1168, 1172 (1st Cir. 1989); *see also United States v. Eaves,* 877 F.2d 943, 946 (11th Cir.1989) (FBI's fictitious business project with no possibility of completion establishes interstate commerce for Hobbs Act jurisdiction), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990). Furthermore, the statute's definition of an attempt to extort as a violation indicates that there is no requirement that the effect on interstate commerce be completed at the time of the violation, and the jury was so instructed. *See* R17–1686. *See also Eaves,* 877 F.2d at 946 (inchoate offense of attempt to violated Hobbs Act establishes jurisdiction). Therefore the trial court's instruction was not erroneous.

## C. SENTENCING

After a sentencing hearing, the district court found that under the federal sentenc-

ing guidelines, including the Nov. 1, 1989 amendments, appellant had a base offense level of 10, which was enhanced to 26 by the following upward adjustments:

| Base Offense Level | | 10 |
|---|---|---|
| § 3A1.1 | (vulnerable or susceptible victim) | +2 |
| § 3B1.1(a) | (organizer or leader) | +4 |
| § 2C1.1(b)(1) | (more than one bribe) | +2 |
| § 2C1.1(b)(2) | (elected official or high office) | +8 |
| TOTAL LEVEL | | 26 |

We find appellant's challenge to the section 3B1.1(a) and section 2C1.1(b)(1) enhancements unsupported because the record clearly shows that appellant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" and because enhancements are simultaneously possible under the plain language of sections 2C1.1(b)(1) and (2). The challenge to the section 3A1.1 enhancement, however, is more substantial and raises an issue that has concerned several courts of appeals.

The relevant portion of the U.S. Sentencing Guidelines reads:

### § 3A1.1. Vulnerable Victim

If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

U.S.S.G. § 3A1.1. The commentary to this section states that the enhancement does not apply if the offense charged already incorporates the vulnerable victim factor. U.S.S.G. § 3A1.1, comment. (n. 2). *See also United States v. Moree*, 897 F.2d 1329, 1335–36 (5th Cir.1990) (prerequisite of crime cannot be enhancing factor under section 3A1.1).

In this case there was no claim that appellant victimized someone who was unusually vulnerable due to physical or mental condition. Here the district court enhanced the sentence because it found that Stewart, the union official and government informant, was "otherwise particularly susceptible" to appellant's advances. The dis-

trict court found the enhancement was justified because of the importance of the coal bill to Stewart's mining constituency (R18–97) and, appellees urge, because Stewart was politically naive and was new to the politics of the Alabama legislature. Appellant responds that not only was Stewart no more susceptible than any other Hobbs Act victim but also he was a government agent at all times relevant to the convictions. The district court's application of section 3A1.1 presents a mixed question of law and fact, which we review de novo. *United States v. Long*, 935 F.2d 1207, 1210–11 (11th Cir.1991); *United States v. Yount*, 960 F.2d 955, 957 (11th Cir.1992). The district court's findings of historical fact, however, cannot be reversed unless clearly erroneous. *United States v. Villali*, 926 F.2d 999, 1000 (11th Cir.1991) (per curiam).

In construing the "otherwise particularly susceptible" language in section 3A1.1, this court has held that circumstances, as well as immutable characteristics, can render a victim of criminal activity unusually vulnerable. *United States v. Villali*, 926 F.2d at 1000; *United States v. Jones*, 899 F.2d 1097, 1100 (11th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990). The question, however, is whether the circumstances of this case rendered Stewart, the victim of Davis' criminal activity, "particularly susceptible" and therefore "unusually vulnerable" to Davis' criminal activity.

The determination of circumstantial or situational susceptibility is especially difficult when the relevant crime is extortion because the perpetrator inherently selects victims on the basis of their perceived weaknesses.[8] Indeed, the very essence of

---

8. According to the language of section 3A1.1, it is the perpetrator's perception, not actual vul-

nerability, that triggers enhancement; thus the fact that Stewart was a government agent does

extortion lies in one party's efforts to capitalize on the vulnerability of another party. Thus, we must ask whether Davis' situation made him more vulnerable than the normal extortion victim. In answering this question, we find guidance in the words of the Fifth Circuit:

> The vulnerability that triggers § 3A1.1 must be an "unusual" vulnerability which is present in only some victims of that type of crime. Otherwise, the defendant's choice of a likely victim does not show the extra measure of criminal depravity which § 3A1.1 intends to more severely punish.

*Moree*, 897 F.2d at 1335. *See also United States v. Cree*, 915 F.2d 352, 354 (8th Cir. 1990). Thus, the defendant's choice of a victim must evince a level of depravity such that the victim is particularly susceptible to the defendant's threats.[9]

The district court in this case treated Stewart as a vulnerable victim because of the importance of the coal bill to his constituents. Although we do not find clearly erroneous the district court's finding that the coal bill was of great importance to Stewart's constituency, we do not feel that the vulnerability resulting from Stewart's responsibility to the union was so unusual that it manifested the level of depravity contemplated by section 3A1.1.[10]

This case is qualitatively different from *United States v. Villali*, supra, in which this court invoked the vulnerable victim enhancement against a defendant who attempted to extort money from a Mr. Sessions by suggesting that he knew the whereabouts of Sessions' daughter, who had been missing for five months. Clearly, Sessions' grief and fear rendered him particularly susceptible to Villali's overtures, and Villali's attempts to capitalize on Sessions' concern for his missing child evinced a level of depravity that called for the extra punishment provided by section 3A1.1. By contrast, Stewart's concerns for his constituency made him no more vulnerable to Davis' overtures than the garden variety extortion victim, whose needs are vital enough to provide the necessary incentive for the would-be extortionist. Further, Davis' attempts—as corrupt as they were—to capitalize on these needs simply did not reach the level of depravity reached in *Villali*. Thus, the district court's application of the 3A1.1 enhancement in this case was error.

### III—CONCLUSION

We affirm the convictions and sentence except for the two-point enhancement under U.S.S.G. § 3A1.1. We vacate the sentence and remand for resentencing in accordance with this opinion.

**AFFIRMED** in part, **REVERSED** and **REMANDED** in part.

EDMONDSON, Circuit Judge, concurring in part and dissenting in part:

I would affirm the district court's judgment in all respects.

I believe Mr. Stewart was—as the district court found and concluded—particu-

---

not affect our analysis because appellant did not know of Stewart's affiliation with the government during the relevant time.

**9.** The inquiry in this case is not unlike the inquiry undertaken by this court in *United States v. Jones*, supra, in which this court held that bank tellers as a class were vulnerable victims under section 3A1.1 in cases involving bank larceny. The *Jones* court distinguished tellers from the general population of larceny victims on the basis of their location in an area of public access, their frequent exposure to members of the public and, above all, their responsibility for large amounts of money. *Jones*, 899 F.2d at 1100. These qualities, the court held, made bank tellers vulnerable to larceny in a manner not shared by a garden variety larceny victim. Because *all* extortion victims share a degree of inherent vulnerability, unlike all larceny victims, application of the section 3A1.1 enhancement in the context of extortion must be reserved for situations where the susceptibility of the victim goes beyond this general degree of susceptibility. Thus, we must examine whether Stewart, by virtue of his circumstances, was "particularly susceptible" to extortion, as bank tellers, by virtue of their circumstances, were to larceny.

**10.** The government's suggestion that Stewart's political naivete and lack of familiarity with Alabama politics rendered him particularly susceptible to the machinations of Representative Davis is without merit.

larly susceptible to extortion. Mr. Stewart was politically naive and, more important, Mr. Stewart's union-worker constituency— many of whom were already unemployed— depended on the health of the Alabama coal industry for their livelihoods which were in jeopardy. I do not believe all victims of extortion by means of fraud are equally vulnerable; although it is true that extortionists choose people who the extortionists believe are vulnerable, vulnerability levels (even among the vulnerable) can vary.

A politically naive local union leader carrying the heavy burden of responsibility for his hard-working constituents' livelihood in difficult economic times looked like easy prey to Davis. Then by invoking the spectre of big businesses' opposition to Stewart's legislative goals, Davis capitalized on Stewart's particular vulnerability even more. And, although I admit that I do not understand the "depravity" standard (it seems too vague to be useful) applied in today's court opinion, I think Davis's conduct was depraved enough to warrant extra punishment.