[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-13140
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 2, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-60317-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ISHMAEL GRANT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 2, 2008)

Before BIRCH, CARNES and WILSON, Circuit Judges.

PER CURIAM:

Ishmael Grant appeals his convictions and 120-month sentence for (1)

conspiracy to commit aggravated identity fraud, mail fraud, and wire fraud, in violation of 18 U.S.C. §§ 371 and 3237; (2) three counts of mail fraud, in violation of 18 U.S.C. § 1341; and (3) three counts of wire fraud, in violation of 18 U.S.C. § 1343. Grant makes four arguments. First, Grant contends that the evidence presented at trial was insufficient to support his convictions. Second, Grant challenges the district court's application of three specific offense characteristic enhancements. Third, Grant argues that the district court incorrectly applied a managerial-role enhancement. Finally, Grant contends that the district court erred in applying a vulnerable-victim enhancement. For the reasons that follow, we are not persuaded by Grant's sufficiency of the evidence argument, nor do we find merit in Grant's challenge of the district court's application of the three specific offense characteristic enhancements or the managerial-role enhancement. However, we conclude that the district court's application of the vulnerable-victim enhancement merits closer attention. Accordingly, we AFFIRM Grant's convictions, VACATE Grant's sentence, and REMAND for resentencing.

## I. BACKGROUND

A. The Conspiracy

Grant, along with ten codefendants, was indicted by a federal grand jury on the following charges: (1) conspiracy to commit aggravated identity fraud, mail

2

fraud, and wire fraud; (2) three counts of mail fraud; and (3) three counts of wire fraud. (R1-18 at 2-48). A joint state and federal investigation revealed a conspiracy that centered around an alleged mortgage broker business, Khadmilroy, Inc. ("Khadmilroy"), which was incorporated in Florida by Yvette Patterson and Grant, a self-styled minister and a primary real estate investor. From about September 2002 through November 2006, by means of a complex scheme to defraud, the conspirators were able to defraud mortgage lenders of their funds by causing the lenders to fund fraudulent mortgages and allowing certain conspirators to obtain control of the real property. Grant and the other conspirators executed the fraud through the U.S. mail and private mail carriers, fax machines, wire transfers of funds, and by using false identification documents of real persons without their authorization or knowledge.

To accomplish the scheme, fraudulent documents were submitted to various mortgage lenders to induce them to fund mortgages sought by various borrowers. Generally, borrowers are required to fill out a Uniform Residential Mortgage Application (Form 1003) with personal information, including social security number, address, date of birth, and employment information. In addition to Form 1003, the mortgage broker is required to send out a Verification of Employment Form (Form 1005) and a Verification of Deposit Form (Form 1006) to the

borrower's employer and bank, respectively, and the employer and bank return these forms to the mortgage broker, who then sends the mortgage application package to the lender for review. The lender relies on the forms sent by the broker in making its decision about whether a given borrower qualifies for a mortgage loan. In this case, Grant and his fellow conspirators fraudulently filled out Forms 1003, 1005, and 1006, included false wage stubs and tax forms, and sent them on to various lenders for review.

As part of the scheme, straw buyers – people used by Grant and the other conspirators to buy properties with fraudulent applications, but who had no intention ever to own or occupy the property – were paid to, or duped into, participating in the conspiracy. Oftentimes, third parties attended the closing, posing as the straw buyer and using false documentation of identity. Once the real estate transaction was completed, the straw buyer did not move into the property. Instead, a conspirator would place a tenant in the residence, collect rent, and pay the monthly mortgage, unbeknownst to the lender, who believed that the buyer was living in the house and that the transaction was legitimate. In some cases, once title passed to the straw buyer, the property would be "flipped" at a higher price to a legitimate buyer or to another straw buyer, rendering a substantial profit on the new sale, and, in other cases, a quit-claim deed was created, which purported to

4

transfer title of the property from the straw buyer to a conspirator.

Patterson, acting as a mortgage broker through Khadmilroy, submitted false mortgage applications to lenders and was involved in the creation of the false documentation required to support these applications. Patterson fled to Jamaica before she could be brought to trial. Grant was an associate of Patterson and, at times, worked as a broker at Khadmilroy. He was heavily involved in the fraudulent buying and flipping of real estate, and he used identity theft victims and unwitting straw buyers to buy nine properties, subsequently quit-claiming the properties to himself or his wife, Mavis Grant ("Mavis"), but leaving the mortgages in the victims' names. As part of the scheme, Grant misled some people into helping him buy houses (Diana Fiala, Louise Mills, Khadine Ricketts, and Henry Foster) and stole the identities of others to accomplish the same goal. Grant also filed a false bankruptcy petition in Ricketts's name and directed Mavis to sign the petition as Ricketts.

B. The Trial

Grant's jury trial was a nine-day affair with over thirty witnesses testifying for the government. We need not recount the testimony of each of those witnesses here. For the sake of judicial economy, we revisit only those witnesses whose testimony has a direct bearing on the issues before us on appeal.

At Grant's trial, Gwendlyn Amica, a college graduate employed by the Internal Revenue Service ("IRS"), testified that she had not applied for a mortgage or attempted to buy property in Florida as of the date of the trial, nor had she authorized anyone to do so in her name. R4 at 56. Amica also testified that she did not know Grant or anyone working for Khadmilroy. Id. at 70-71. In November 2005, Amica was advised by the police that someone had attempted to buy two properties in her name and had filled out a Form 1003 using her name and social security number. Id. at 59-61. Although her name appeared on a sale contract for a property purchased under her name, Amica denied ever participating in the purchase or ever authorizing anyone to purchase any property in her name. Id. at 90. Mavis and Grant's names also appeared on the contract. Id. at 83.

Roosevelt Dozier, one of Grant's codefendants and the owner of a home building company, also testified. He stated that he would see Grant at Khadmilroy approximately three to four times per week, and Grant would find properties and provide Patterson with the contracts for them. Id. at 123. He stated that Grant and Patterson would review the contract information, at which point Patterson would tell Grant that he had to pay for a Verification of Employment (Form 1005) form to be completed. Id. at 124. According to Dozier, Christine Brown, one of Grant's codefendants, told him that Grant was going to pay her $5000 to go to closings and

pose as Amica. Id. at 125. He further testified that he witnessed Grant pay Patterson for false Verification of Employment forms approximately three or four times. Id. at 128. Dozier also stated that he was present for discussions that took place between Patterson, Grant, and Keith Humes, another Khadmilroy employee. The three would discuss using the social security numbers of unsuspecting individuals to purchase property in the event that they did not have a "real buyer." Id. at 134-35. He also described a quit-claim deed provided by Juliet Murdock to Grant and Mavis, which was notarized by Patterson.[1] Id. at 137-39. Finally, Dozier testified that when he and Grant were brought into court in November 2006, Grant told him that Mavis had no involvement in the conspiracy and admitted that only he and Patterson were involved. Id. at 150.

On cross-examination, Dozier testified that either Patterson or another Khadmilroy employee would actually prepare the false documentation used in the scheme. Id. at 175. He further testified that the quit-claim deed that was transferred from Murdock to Grant and Mavis was false because Murdock was not present to prepare it. In Murdock's absence, Patterson prepared the document and forged Murdock's signature so that the title would be transferred to Grant and

---

[1] Murdock later testified that she never quitclaimed the property to Mavis and Grant. R5 at 202-05.

7

Mavis.[2]  Id. at 175-76.  Dozier stated that Grant was trying to purchase homes for less than the asking price, so that he could secure a loan in the amount of the asking price and then keep the difference.  Id. at 190.  Furthermore, Dozier testified, Grant would try to get a tenant to live in the homes which he purchased or would try to "flip" the houses by selling them immediately for more than he paid for them.  Id. at 191.

Next, Elvis Pickering, a loan officer with Eagle First Mortgage, testified. Pickering handled potential as well as existing homeowners.  He would review their credit histories and discuss home loan or loan refinancing options with them. R5 at 75-76.  Pickering recounted a telephone conversation that he had with Grant in 2005, during which Grant stated that he had a property that he wished to refinance.  Id. at 78.  Grant's name was on the title of the property because it had been quit-claimed to him.  Id. at 79.  Based on Grant's low credit score, Pickering told him that he could not refinance the existing loan in Grant's name.  Id. at 80. Pickering testified that he discovered that Grant was paying off a prior bank loan under the name of Kimberly Reveille, whom Grant claimed had quit-claimed the title to him.[3]  Id. at 141-42.

---

[2] Dozier stated that Patterson prepared the quitclaim deed at Grant's request and in his presence.  Id. at 175-76.

[3] Reveille, a McDonald's manager in school studying to become a diagnostic ultrasound technician, had previously lost her wallet.  The wallet contained her driver's license, Social

Khadine Ricketts, a house cleaner who knew Grant as a minister, testified next, stating that Grant told her that he had bad credit, but wished to buy a house so that she and several other church members could live there for six months to a year. Id. at 147-49. Ricketts was to buy the house, but Grant would pay the mortgage, and, after six months, Grant would "take [her] name out of it" by having her sign the house over to him. Id. at 149. She testified that she completed a mortgage application on the house. Id. at 152. Ricketts further testified that she never met Patterson, and she did not authorize anyone to fill out documents on her behalf. Id. at 155-57. After the closing date on the house, Ricketts testified, she contacted Grant to see when she could move into the house, but he gave her "the runaround," and she never was able to move in. Id. at 165. Although a quit-claim deed was prepared which transferred title of Ricketts's property to Grant, Ricketts testified that she had never seen the deed, and she did not sign it. Id. at 166-68. On cross-examination, Ricketts stated that she did not see Grant fill out the false information that was on the documents at closing. Id. at 176-77. In fact, the documents already were prepared, and she signed them. Id. at 177.

---

Security card, and other documents. R6 at 152. Some time later, when she attempted to rent an apartment, a credit check revealed that she owned a house which she knew nothing about. Id. at 153. She was later served with foreclosure papers for the property, even though she had never contracted to purchase it or had ever applied for a mortgage. Reveille had never met Grant and did not know him. Id. at 169.

Next, Murdock testified that she purchased a home for Grant at the behest of her friend Fitzgerald Puddie. R5 at 181. She also testified that she did not complete a mortgage application, and the personal information contained in the mortgage application that was prepared in her name was false. Id. at 183-87. She stated that she went to the closing with Grant, whom she had not previously met, and she signed a lot of papers, but she did not read any of them. Id. at 195-96. According to Murdock, her understanding was that Grant would pay the mortgage. Murdock never intended to move into the house. Id. at 200. She testified that she did not sign a quit-claim deed on the property or authorize anyone to do so. Id. at 202, 205.

Christopher Longhini, a lender who worked for A Mortgage Solution USA, testified that he received a phone call from Puddie, who stated that he was trying to sell a piece of property to Grant. However, Longhini determined that Grant's credit score was too low to approve him for a loan. R6 at 8-9. Several days later, Puddie called Longhini for a second time and stated that he had a new buyer for the property – Murdock. Puddie provided Longhini with Murdock's credit information. Id. at 9. After Longhini determined that Murdock's credit was sufficient to receive a loan, Puddie brought in the necessary identification documents to Longhini, and Longhini prepared the Form 1003 and other

10

paperwork. Id. at 9-11. Longhini then sent the mortgage documents on to Encore Credit, a sub-prime lender, and Encore Credit approved Murdock's loan application. Id. at 14-16.

Brown also testified against Grant at trial. She testified that she attended a closing in which she pretended to be Amica by using false identification, and that she signed all of the loan documents with Amica's signature. Id. at 112-14. She also stated that Grant became angry with her because she did not ensure that her signature matched that of Amica's during the closing. The mistake caused Brown and Patterson to be arrested and Grant had to post bond for their release the next day. Id. at 138.

Diane Fiala, a friend of Mavis's who holds a college degree from George Washington University, testified that Grant asked her to co-sign a loan for him to buy a home for his son. R7 at 128, 132. Although she signed documents at a closing on a property that she purchased for Grant – which was the only time that she signed any documents – she did not fill out a mortgage application. Id. at 133-134, 142. She testified that although she felt uncomfortable about co-signing, Grant assured her that his son would refinance the loan within one month and she would not have any liability. Id. at 143-45. On cross-examination, Fiala testified that she "never dreamed that . . . [she] was not the co-signor," and instead, was the

primary owner, and she did not think that she did anything illegal because she had no idea what was really going on. Id. at 163-64.

At the close of the government's case-in-chief, Grant made a motion for a judgment of acquittal, arguing that there was no evidence that he had a specific intent to defraud anyone, nor was there any evidence that he conspired with anyone to do anything illegal. R9 at 70-71. He further argued that no witness had stated that he personally prepared any of the false documents or knew that there were false statements in any documents. Id. at 71. The district court denied this motion. Id..

Grant testified in his own defense. He claimed that he met Ricketts at a religious meeting over which he presided as minister. R10 at 47. He stated that he asked Ricketts to buy a house for him in her name because he had a tax lien against him and could not put the house in his name because of that. Id. at 47-48. He denied knowing that it was wrong to put Rickett's name on the mortgage at the closing. Id. at 50. According to Grant, Ricketts lied when she testified that she did not prepare a quit-claim deed on the property that she purchased for him. Id. at 51. Grant did admit to being present when his wife signed a bankruptcy petition in Rickett's name, id. at 57-58, but then later denied doing anything wrong in the course of his dealings. Id. at 80. He further testified that Dozier lied on the stand,

12

because he was not present when Patterson signed Murdock's name on the quit-claim deed, and he did not see Patterson prepare any false documents.  Id. at 128.  Grant testified that he never prepared any false documents in the case.  Id. at 129.  He further stated that he did not know that Brown was fraudulently posing as a home buyer.  Id. at 139.  Finally, Grant denied the allegations against him and renewed his motion for judgment of acquittal, which the district court denied.  R11 at 42-43.  The jury found Grant guilty on all counts.  R1-213.

C.  Sentencing

In accordance with U.S.S.G. § 2B1.1(a)(1), Grant's base offense level was initially set at 7.  Because the loss was more than $70,000, but not more than $120,000, the offense level was increased by eight levels, pursuant to § 2B1.1(b)(1)(E).  It was increased an additional two levels, pursuant to § 2B1.1(b)(8)(B), as the offense involved a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding, and an additional two levels based on a sophisticated means enhancement, pursuant to § 2B1.1(b)(9)(C).  Finally, because the offense involved the unauthorized transfer or use of a means of identification unlawfully to produce or obtain another means of identification, the offense level was increased by an additional two levels, pursuant to § 2B1.1(b)(10)(C)(i).  His offense level ordinarily would have been increased by

13

yet two more levels because Grant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of his offense. However, pursuant to § 2B1.1(b)(13)(A) and (D), the offense level was set at 24. Although the two-level increase would have yielded an offense level of 23, the guideline directs that the base offense level be set at 24 where the resulting offense level otherwise would be less than 24. See U.S.S.G. § 2B1.1(b)(13)(D) (Nov. 2006).

Grant's offense level of 24 was increased an additional two levels pursuant to U.S.S.G. § 3A1.1(b)(1), because the offense ostensibly involved a vulnerable victim. A four-level leadership role enhancement was also applied, resulting in a total offense level of 30. See U.S.S.G. § 3B1.1(a). Accordingly, with a criminal history category of I, the resulting guideline range was 97 to 121 months of imprisonment.

At sentencing, Grant challenged application of the sophisticated means enhancement, arguing that he was "an incredibly unsophisticated man," and that he did not prepare any of the false documentation in the case or otherwise act in a sophisticated manner, nor did he attempt to hide anything. R13 at 12. He also contended that he should not receive an enhancement for the unauthorized use or transfer of a means of identification because he did not have any knowledge that anyone was not whom he or she claimed to be, or that anyone was using fraudulent

14

identification. Id. at 13. Next, Grant argued that the vulnerable victim enhancement should not be applied because any victims in the case were either unindicted codefendants who participated in the scheme or the mortgage and lending companies. Id. at 14. Finally, Grant objected to the four-level aggravating-role enhancement, because the only person whom he controlled was his wife, and he was "clearly a follower" who was taken advantage of by Patterson. Id. at 14-15.

The district court overruled Grant's objection to the sophisticated means enhancement, finding that the whole operation, as well as Grant's role in it, was "very sophisticated." Id. at 31. It also overruled his objection to the unauthorized use of a means of identification enhancement, as this scheme involved people being given false identifications, which were used so that the participants could pretend to be other people at closings. Id. at 32. Next, the court stated that, although the actual victims in this case were not vulnerable, the scheme was committed using vulnerable people as pawns to perpetrate the fraud, such that the enhancement was warranted. Id.. Finally, the court determined that Grant was a manager or supervisor of other individuals in the case, as he supervised his wife and also was an organizer or leader of others in the scheme. Id. at 33. The court sentenced Grant to 120 months of imprisonment. Id. at 35.

Grant now appeals his convictions and sentence to us. We consider his

15

sufficiency of the evidence argument first.

## II. DISCUSSION

We review de novo the sufficiency of the evidence supporting a criminal conviction. United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005). In doing so, we review the evidence in the light most favorable to the government, "drawing all reasonable inferences and making all credibility choices in the government's favor." Id. We will reverse a conviction based on insufficient evidence "only if no reasonable trier of fact could have found guilt beyond a reasonable doubt." United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004) (per curiam).

To sustain a conviction under the mail and wire fraud statutes, for which the same analysis is applied, the government must prove the following elements: (1) the intentional participation in a scheme to defraud; and (2) the use of the interstate or foreign mail or wires in furtherance of the scheme. United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003). "A scheme to defraud requires proof of material misrepresentations . . . reasonably calculated to deceive persons of ordinary prudence." Id. at 1270-71 (citations omitted) (stating that "[a] material misrepresentation is one having a natural tendency to influence, or capable of influencing the decision maker to whom it is addressed").

16

The existence of a conspiracy can be proven by either direct or circumstantial evidence, and the government need not prove that the conspirator knew all of the details of the conspiracy or participated in every phase of the scheme. United States v. Guerrero, 935 F.2d 189, 192 (11th Cir. 1991). The elements of a conspiracy under 18 U.S.C. § 371 include: (1) an agreement among two or more individuals to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement. United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir. 1998). To prove a conspiracy to commit wire fraud, the government need not demonstrate an agreement specifically to use the interstate wires to further the scheme to defraud, but instead, it is enough to prove that the defendant knowingly and voluntarily agreed to participate in a scheme to defraud and that the use of the interstate wires in furtherance of the scheme was reasonably foreseeable. United States v. Ross, 131 F.3d 970, 984 (11th Cir. 1997).

Grant's only challenge to the sufficiency of the evidence appears to be that the government did not establish that he completed any of the documentation relied upon by a lender to extend a mortgage loan. However, this was not a necessary element of the mail or fraud charges, or of the conspiracy charge. To sustain a conviction under the mail and wire fraud statutes, the government was required to

17

prove that Grant intentionally participated in a scheme to defraud, which must be shown by proof of material misrepresentations, and the testimony at trial sufficiently established this element. See Hasson, 333 F.3d at 1270. The trial testimony also sufficiently established that Grant was involved in a conspiracy to commit wire and mail fraud because he knowingly and voluntarily agreed to participate in a scheme to defraud. See Ross, 131 F.3d at 984. Although Grant sought to exonerate himself through his own testimony, the jury was free to make credibility determinations and weigh the evidence in determining Grant's guilt.[4]

First, Amica and Brown's testimony established that Grant improperly used Amica's identity to apply for a mortgage and to purchase a piece of property without her permission. See R4 at 56, 83; R6 at 112-14. Amica testified that although her name was on a contract for the sale and purchase of a property, she did not participate in the purchase or have any knowledge of it, and the fact that Grant's name also was on the contract is evidence of his participation in this fraudulent act. See R4 at 83. Moreover, Dozier testified that Brown stated that Grant offered to pay her $5000 to go to closings and pose as Amica, and Brown

_____

[4] Indeed, Grant's testimony may have caused the jury to use it as substantive evidence of his guilt. See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (noting that "a statement by a defendant, if disbelieved by the jury, may be considered as *substantive evidence* of the defendant's guilt").

18

testified that she did, in fact, attend a closing in which she posed as Amica and signed loan documents in Amica's name.  See R4 at 125; R6 at 112-14.

Second, several witnesses testified regarding quit-claim deeds that fraudulently were prepared and signed in their names, which relinquished their title to Grant.  Despite the fact that a quit-claim deed was prepared with Murdock's signature, she testified that she never signed the deed, nor did she authorize anyone to do so, and Dozier testified that Murdock was not present when the deed was prepared and signed by Patterson.  See R5 at 202-05; R4 at 175-76.  Ricketts also testified that a quit-claim deed was prepared for the property that she had purchased for Grant, which transferred the title to Grant, but she had never seen the deed, or signed it.  See R5 at 166-68.

Third, trial testimony also established that Grant fraudulently filed mortgage applications in other people's names, without their knowledge or consent.  Fiala testified that she did not fill out a mortgage application, despite the fact that one was completed in her name.  See R7 at 133-34.  Fiala further was defrauded by Grant because he told her that she would be only a co-signor on the purchase of a property for Grant's son, but the documents that she signed made her the sole owner of the property.  See id. at 143-45, 163-64.  Longhini testified that Puddie provided him with Murdock's personal and credit information so that he could

secure a mortgage in her name, but Murdock testified that she did not complete a

mortgage application, and the personal information contained in the application

that was prepared in her name was false.  See R5 at 183-87; R6 at 9-11.

Fourth, the evidence at trial showed that Grant recruited straw purchasers to

purchase homes for him in their own names and that Grant promised to pay the

mortgages associated with the properties himself.  Ricketts testified that Grant

asked her to buy a house for him because he had bad credit.  Grant told Ricketts

that he would allow her to live in the property for six months, at which point he

would have her sign the house over to him.  See R5 at 148-49.  Murdock also

testified that she was asked to buy a home for Grant, and Grant would pay the

mortgage.  See id. at 183, 200.  Finally, Fiala testified that Grant asked her to co-

sign a mortgage loan for him to purchase a home for his son, but Fiala became the

sole name on the mortgage when she signed the documents, despite not having

completed a mortgage application.  See R7 at 133-34.

We conclude that ample evidence points to Grant's participation in a scheme

to defraud various individuals and mortgage lenders.  The evidence shows that he

made multiple material misrepresentations that were intended to deceive.[5]

---

[5] We find Grant's reliance on our decision in United States v. Brown, 79 F.3d 1550 (11th
Cir. 1996), to be misplaced.  In Brown, we found that the evidence established that the
defendants, through their failure to discipline their salespeople, acted to authorize
misrepresentations by salespeople to customers about the value of the homes that they were
buying, and also committed acts intended to disguise the investment potential of homes that the

20

Accordingly, the evidence presented was sufficient to sustain Grant's convictions on the mail and wire fraud charges.

Similarly, the trial testimony was sufficient to establish that Grant participated in a conspiracy to commit mail and wire fraud. Dozier testified that he witnessed Grant pay Patterson for false Verification of Employment forms. He also heard Patterson, Grant, and another Khadmilroy employee discuss how they might use the social security numbers of unsuspecting individuals in lieu of "real buyers." See R4 at 128, 134-35. Dozier also testified that Patterson notarized a quit-claim deed purporting to transfer the title of a property from Murdock to Grant and Mavis. See id. at 138-39. Finally, according to Dozier, Grant admitted that his wife had no hand in the scheme and that it was he and Patterson who were involved. See id. at 150.

We now turn to the district court's application of the three specific offense characteristic enhancements. Grant challenges the district court's imposition of specific offense characteristics based on: (1) fraudulent actions during the course of a bankruptcy proceeding; (2) the use of sophisticated means to commit the offense; and (3) the unauthorized transfer or use of a means of identification.

---

defendants sold. Id. at 1555-56. In this case, however, Grant was not entering into arm's length transactions with the victims who he enticed into essentially buying him a home, and the jury could find that the mortgage lenders who received fraudulent documents from him would rely on his representations.

Assuming Grant derived more than $1,000,000 in gross receipts, the specific offense characteristics that were added to the base offense level brought his total offense level to 23. See U.S.S.G. § 2B1.1(b)(13)(A). By operation of § 2B1.1(b)(13)(D), Grant's offense level increased to 24. See U.S.S.G. § 2B1.1(b)(13)(D). Because § 2B1.1(b)(13)(D) mandates an increase in offense level to 24 regardless of the specific offense characteristics added to the base offense level prior to the application of § 2B1.1(b)(13)(D), any error that the district court may have committed in applying these previous enhancements was harmless. See United States v. Williams, 503 U.S. 193, 203, 112 S. Ct. 1112, 1120-21 (1992).

Grant's challenge of the managerial-role enhancement, see U.S.S.G. § 3B1.1(a), does not stand close scrutiny either. Grant does not challenge the district court's finding that he was the leader or organizer of at least one person, namely his wife. Nor does he contest the court's determination that the criminal activity at issue involved five or more participants. As such, the record provides no indication that the district court erred in its determination that Grant "was a manager in a certainly otherwise extensive criminal activity." R13 at 33.

Finally, we now consider the district court's application of the vulnerable victim enhancement. The district court's application of U.S.S.G § 3A1.1 presents

22

a mixed question of law and fact, subject to de novo review, but the district court's determination of a victim's "vulnerability" is a factual finding given due deference. United States v. Amedeo, 370 F.3d 1305, 1317 (11th Cir. 2004). A vulnerable victim for purposes of an enhancement under § 3A1.1 refers to one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, comment. (n.2). This adjustment is appropriate only when the victim is targeted based on the defendant's perception of the victim's vulnerability. United States v. Arguedas, 86 F.3d 1054, 1058 (11th Cir. 1996). For purposes of subsection (b), a victim can be a victim of any relevant conduct for which the defendant is accountable. See U.S.S.G. § 3A1.1, comment. (n.2).

In construing the "otherwise particularly susceptible" language of § 3A1.1, we have "held that circumstances, as well as immutable characteristics, can render a victim of criminal activity unusually vulnerable." United States v. Davis, 967 F.2d 516, 523 (11th Cir. 1992). We have upheld vulnerable victim enhancements where: (1) the defendant extorted money from the father of a missing child, promising to reveal the location of the child, United States v. Villali, 926 F.2d 999, 1000 (11th Cir. 1991) (per curiam); (2) the defendant, a bank officer, embezzled money from the trust accounts of elderly persons, United States v. Yount, 960 F.2d

23

955, 957-58 (11th Cir. 1992); (3) the defendant in a loan fraud scheme targeted consumers with bad credit, United States v. Page, 69 F.3d 482, 490-91 (11th Cir. 1995); (4) the defendant, a former local police chief, robbed a rural bank when he knew that police would not be in the area, United States v. Phillips, 287 F.3d 1053, 1056-58 (11th Cir. 2002); (5) the defendant provided narcotics to a minor victim, whom the defendant knew suffered from a drug addiction, Amedeo, 370 F.3d at 1317-18; (6) the defendant, based upon a personal relationship with the victim, knew of the victim's troubled financial situation, Arguedas, 86 F.3d at 1057-58; and (7) the defendant in a car jacking case knew that the victim, a cab driver, had a duty to respond to all dispatches and would have to pick him up, United States v. Frank, 247 F.3d 1257, 1259-60 (11th Cir. 2001).

In this case, the district court made the following finding:

> The actual victims in this case I don't think were vulnerable in this case, but the way that the crimes were committed, the way the – sophisticated way that these frauds were able to be perpetrated was to use vulnerable people as pawns to be able to perpetrate the fraud to bring in Mr. Foster who certainly is challenged in many ways to help assist unwittingly in the crime.
> Mr. Wyles (phonetic), the churchgoer, Ms. Fiala, all of those people were vulnerable for one reason or another because of their physical maladies, Ms. Fiala's religious beliefs causing her to trust Mr. Grant. And although their participation in the crime bordered on being an accomplice, bordered on being criminally involved, they also were unwitting victims also in the way that they were utilized and used in the case. And I think this a close issue, but I am going to overrule the objection to vulnerable victims and find that Mr. Grant

24

knew or should have known that the individuals that were involved in this case that were used to commit these crimes were vulnerable. So I am going to overrule that objection.

R13 at 32-33. After according due deference to the district court's findings, we are not convinced that they adequately support the application of the § 3A1.1 enhancement. First, the district court's determination that Mr. Grant's "unwitting victims" and "pawns" were vulnerable is not enough. We have consistently held that "[t]he vulnerability that triggers § 3A1.1 must be an <u>unusual</u> vulnerability which is present in only some victims of that type of crime." <u>Davis</u>, 967 F.2d at 524 (emphasis added) (quotation marks omitted). Accordingly, the correct inquiry is not whether a given fraud victim was vulnerable, but whether Grant specifically targeted a particular victim who was "more vulnerable that the normal [fraud] victim." <u>Id.</u>

The district court specifically identifies Mr. Henry Foster[6] and Ms. Fiala as being unwitting victims of Mr. Grant's scheme. Although the record does suggest that Foster had some hearing problems, <u>see</u> R8 at 6, there is no indication that Grant specifically targeted Foster because of his age or physical infirmities or that

---

[6] Foster was a sixty-seven year old mechanic with a grammar school education. R8 at 4. Grant recruited Foster to purchase a home for Grant and promised Foster a cut of whatever proceeds resulted from the deal. <u>Id.</u> at 13. Grant escorted Foster to the property closing and Foster signed the closing documents but did not understand their significance. <u>Id.</u> at 10, 12-13.

he was otherwise unusually vulnerable. Indeed, it appears that Foster willingly entered into the deal proposed by Grant and hoped to come away with a profit. Id. at 13.

Fiala's status as an putative "unusually vulnerable victim" is equally suspect. As previously noted, Fiala holds a Bachelor of Arts degree in English literature from George Washington University. Her trial testimony indicated that she was wary of entering into a business relationship with Grant. R7 at 132, 143-44. Even after finally agreeing to do so, Fiala insisted on drafting an additional document specifying when her liability would cease and when she would quitclaim the property to Grant. Id. at 149. Such actions evidence a degree of sophistication that would seem to elevate her from the ranks of the "unusually vulnerable."

Finally, the district court cites Fiala's religious beliefs as "causing her to trust" Grant. R13 at 32. We have yet to consider a case in which a person's religious beliefs render him or her unusually vulnerable within the meaning of § 3A1.1. The paucity of any such evidence in the record before us does not allow us to visit that issue at this point. While the record does indicate that Fiala was a religious person and frequently attended religious services with Grant's wife, R7 at 129, it does not support the inference that Fiala was rendered unusually vulnerable to Grant's scheme because of her religious convictions or that Grant targeted her

because she was particularly religious.

### III. CONCLUSION

Grant appeals his convictions and 120-month sentence for (1) conspiracy to commit aggravated identity fraud, mail fraud, and wire fraud; (2) three counts of mail fraud; and (3) three counts of wire fraud. We are not persuaded by Grant's sufficiency of the evidence argument and we find no merit in Grant's challenge of the district court's application of the three specific offense characteristic enhancements and the managerial-role enhancement. However, we conclude that the district court's application of the vulnerable-victim enhancement is not adequately supported by the evidence in the record. Accordingly, we AFFIRM Grant's convictions, VACATE Grant's sentence, and REMAND for resentencing.